# EXHIBIT A

In the Matter of Arbitration

Between

_____

C & S Wholesale Grocers, Inc.                :

        Employer                :

                    :   AAA No. 01-16-0004-5945

     And                :

N.Y. State Teamsters Conference                :
Pension and Retirement Fund
                :

      Fund

_____

_____

## OPINION AND AWARD

### BACKGROUND

      This matter came before me for hearing over four days in 2019: January 29th and 30th , April 8th and May 21st .[1] The Fund is a multiemployer pension plan, some of whose

_____

[1] The witnesses called were as follows:

      By C & S:

               Jay K. Egelberg  - Actuary
               Stanley Goldfarb,  Horizon Actuarial Consulting and lead
                       actuary for the Fund; called as on cross
                       examination
               Breck Sherwood -  Horizon Actuarial Consulting
               Kenneth Stilwell - Executive Administrator of the Fund;
                       called as on cross examination
                       and on rebuttal
             Richard Cobb -   Attorney for C & S in Penn Traffic
                       bankruptcy; on rebuttal
             Kerri Mumford  -   Attorney for C & S in Penn Traffic
                       bankruptcy

employee/participants worked for a bankrupt company named Penn Traffic, a company which provided "procurement, warehousing, and distribution services for grocery businesses across the United States"[2]. In 2010, Penn Traffic withdrew from the Fund and was assessed withdrawal liability. The Employer here, C & S, purchased some assets of the defunct company somewhat before Penn Traffic's bankruptcy,[3] and the withdrawal liability was transferred to C & S by the Fund.[4] Whether C & S is liable, as a successor,

 

| | |
|---|---|
| Mark Gross - | Surry Investment Advisors; representativ e of C & S on the creditors' committee in Penn Traffic Bankruptcy |

By the Fund:

      Vincent Frank Spina - President, BPAS Actuarial & Pension Services

      Victor Philip Harte - Milliman Actuarial Consulting
      Vincent DeBella - Counsel to the Fund

The Exhibits submitted are too numerous to be set forth here. The parties are referred to the transcript of the proceedings.

---

[2]See New York State Teamsters Conference Pension and Retirement Fund v. C & S Wholesale Grocers, Inc. 5:16-CV-84 (FJS/ATB) (U.S.D.C., N.D. New York - 3/18/20), p. 2. This case was handed down after the close of the hearing and when issued, it was provided to the Arbitrator.

[3]Ibid, p. 3. The Court indicates, from the Defendant's Statement of Undisputed Material Facts (DSUMF) that C & S purchased Penn Traffic's relationships and contracts with wholesale customers in 2008 in exchange for a cash payment. According to the DSUMF, C & S did not purchase the warehouses, trucks, trailers, forklifts or retail stores owned by Penn Traffic.

[4]The Court further noted that C & S hired 30 Penn Traffic employees pursuant to its agreement with Penn Traffic, but none were members of Teamsters Local 317, the local which had represented Penn Traffic employees at the Syracuse Warehouse and on whose behalf Penn Traffic made contributions to the Fund. Ibid, at p. 3. C & S did, however, subcontract with Penn Traffic, to continue the work performed by Penn Traffic. Ibid, p. 8. Indeed from December 2008 until the closing of the Syracuse warehouse, Penn Traffic retained the authority to deal with its employees regarding,

for the withdrawal liability of Penn Traffic was, fortunately, not an issue before the undersigned.  During the pendency of the case before me, that issue was being dealt with by the United States District Court for the Northern District of New York [New York State Teamsters Conference Pension and Retirement Fund v. C & S  Wholesale Grocers Inc. (5:16-CV-84) (March 18, 2020)][5]   The gravamen of the dispute before me concerns the amount of the withdrawal liability which was assessed by the Fund at $63,592,68.          .

Each year, an Actuarial Evaluation Report is prepared by the Fund Actuaries, here Horizon Actuarial Services (TR-217). The report, issued on October 8, 2009, for example, notes that "(t)he primary purpose of this valuation is to determine contribution requirements for the plan under the Infernal Revenue Code for plan year beginning January 1, 2009, and the tax year ending December 31, 2009." (Ex. C-25, p.1).  In coming up with an amount needed for contributions by Employers during the 2009 calendar year, the actuaries considered the ages of the employees in the Fund and their mortality rates, in order to reasonably estimate when such employees would retire and the amounts that would have to be paid out to them over their lifetimes.  In so doing, they looked to established tables, such as the RP-2000, a mortality table for blue collar males.  (TR-225). The actuaries also looked at the earnings experience of the Fund to estimate at what rate the Fund would grow.  For example, in Exhibit C-25, the Report prepared in 2009, the valuation interest rate was 8.5%,[6] as it was in 2008 (Ex. C-25, p. 14).  With these assumptions, among others, they estimated any shortfalls in funds which could have resulted between the estimated difference in the current value of the Fund and its current liabilities, [7]   If the Fund fell short,  increases in the contribution rate of employers  would be instituted, or,

_____

hiring, termination and discipline. Ibid, p. 10.

[5]The Court issued its Opinion on March 18, 2020 finding that C & S was not liable for the withdrawal liability of Penn Traffic.  However, in a post hearing telecon between Counsel for each party and myself, the Fund indicated it intended to appeal the decision of the District Court to the Circuit Court of Appeals.  Initially, C & S argued that the arbitration was at this point mute, and that the arbitrator should only continue with the issuance of the decision should, at some point in the future, the Circuit Court reverse the District Court.  I advised that, in all likelihood, I would be retired if and when such an eventuality occurred, and it would be difficult, years after the hearing, to write up the decision should that be necessary.  After consultation with his client, Counsel for the Employer agreed that this arbitrator should continue work on the Opinion and issue it in due course.

[6]This was the rate referred to throughout the hearing as the minimum funding rate, for it was the rate used by the Fund to determine any unfunded liability, and thus the minimum funding requirements, or necessary employer contributions for the year.

[7]See for Example, Exhibit C-25, p. 14, where based on the assumptions used, in 2009, there was an "Unfunded actuarial accrued liability of $1,588,356,495.

alternatively, benefits to pensioners would be reduced.

As the actuaries determined the interest rate to be used for minimum funding contributions to the plan, so too did they make determinations of the interest rate to be used for withdrawal liability. In layman's terms, withdrawal liability is an amount of money which is assessed against a withdrawing employer where shortfalls result between the estimated value of the assets of the plan, which are used to pay the liabilities, and the liabilities themselves. Withdrawal liability essentially is the payment of a debt. (TR-271). In an overly simplified hypothetical example, if a fund has an estimated current value of $2,000,000 in assets but $3,000,000 in estimated liabilities (the present value of vested benefits) there is a $1,000,000 shortfall. This shortfall is referred to as Unfunded Vested Benefits, (UVB's). If an Employer decides to withdraw, it has to pay its share of the UVB's, which, in an overly simplified explanation of the process, is determined by allocating that portion of the shortfall that must be made up for that employer's employees. Very loosely, if an Employer employs 20% of a Fund's members, that Employer is responsible for 20% of the shortfall. See 29 U.S.C. Section 1381(b).

ERISA limits the annual contribution that can be demanded of a withdrawing employer and also limits the number of annual contributions to a 20 year period (TR-281,284). The Fund's actuaries, Horizon Actuarial Services, testified that because of the legal limits, the full amount of liability is rarely obtained. Moreover, once withdrawal liability is assessed against the withdrawing employer, that amount is the final amount of liability that can be assessed by the Fund against the Employer. If, for example, the estimated earnings of the assets were overestimated by the actuaries, and the Fund's financial health begins to decline in relation to the liabilities it faces, the Fund cannot go back in future years, as it can to the employers remaining in the Fund, to ask the withdrawing employer for increased contributions. (TR-265). The Fund gets one bite at the withdrawing employer's apple. (TR-267).

Prior to 2009, the actuaries had always used the same interest rate when calculating the present value of withdrawal liabilities as they had used in their calculations for determining the minimum payments to the Fund. Had they used the same interest rate for 2010 withdrawals as they had in 2009, the interest rate[8] for withdrawal liability applied to Penn Traffic would have been 8.5%.

However, around September, 2009, Stan Goldfarb, a member of the Horizon firm, began to think about using the assumptions of the PBGC for mass withdrawals in calculating withdrawal liability. (TR-363, 442-43). The rates of the PBGC are based on a hypothetical pool of assets and thus the actual assets possessed by the NY State Teamsters Pension Fund would not be used in calculations. The PBGC rates were also reflective of a more conservative investment portfolio than the portfolio held by the Fund

---

[8] The interest rate is the discount rate for determining the present value of Fund liabilities for withdrawal liability purposes.

here. (TR-254).   Also, prior to 2009, in determining the value of liabilities, the actuaries used a mortality table, referred to as the RP-2000 table, which is based on the mortality of blue collar male workers. (TR-235).  The PBGC, however, used the UP-94 table (TR-236-37), which has more women than the other table, and also has employees in white collar professions who tend to live longer. (TR-239; Ex. C-3,1).   If the PBGC assumptions were used (changing the interest rate, from 8.5% used by the actuaries to 5.3% used by the PBGC and the mortality table from the RP-2000 to the UP-94), the amount of withdrawal liability for any withdrawing employer would be increased. This is so for two reasons.  First, when calculating the present value of the liabilities, the lower the interest rate, the higher is the amount of funds calculated as the present value of future liabilities; interest rates work inversely in relation to the present value of the pool of assets.  Second, when mortality tables change, a group of workers who generally live longer than blue collar workers (white collar workers and females) is used, and thus, you will need a greater pool of money at the outset to insure you can cover future liabilities for those who will live longer lives.

Such changes in assumptions were contemplated for several reasons.[9]  First, when the capital markets crashed in 2008-2009, the Fund experienced a *negative* 30% rate of return (TR-274).  Thus, the Fund experienced a 38.5% less rate of return than had been estimated by the actuaries.[10]  Second, the fund was viewed by the actuaries as one that would have difficulty meeting its estimated financial needs.[11]  However, when Goldfarb shared such ideas about a change in assumptions with his colleague Breck Sherwood, Sherwood advised that the calculations had already been determined for 2009 (TR - 442).  Therefore, the Horizon firm waited until May, 2010 before advising the Trustees of the Fund of their decision to move withdrawal liability assumptions from those previously used

---

[9]The determination to change the rate to the PBGC rate was made by Goldfarb and not the Trustees. (Tr-364). Legally, it is Goldfarb's decision. (TR-367), but respect for the client (the Fund), led the actuaries to seek consent of the Trustees (TR - 368 - 69).

[10]The actuaries thought the Fund would earn 8.5% but it dropped by 30%, for a total variance, from the estimate of -38.5%.   There was a fear by the actuaries that the Fund could go into a death spiral.  The rehabilitation plan assumed certain increased contributions.  However, if Employers found such contributions too difficult to make, they could opt to withdraw, and then the estimates of the anticipated future contributions go down since those employers are leaving the Fund.  As employers withdraw, It becomes more and more difficult for remaining employers to make up the difference between assets on hand to pay liabilities and assets needed to pay liabilities.  Thus, the plan can go into a death spiral.  (TR - 270-71).

[11] The Fund was formally certified by the actuaries as in "critical status" in March, 2010, (TR-258, 259), but they obviously were aware of the fund's dire straits in 2009.  As noted by Goldfarb the certification issue was "no surprise".  (TR-258).

to those used by the PBGC.

The decision to change the rates was one by the actuaries (TR-364), but the Trustees nonetheless indicated their approval, and they have been applied to every withdrawing employer in 2010 and thereafter.  The problem before me arises, however, because of the provisions in ERISA at 29 U.S.C. Section 1391, which provide various rules for the calculation of withdrawal liability.  The rules, calculate the liabilities of withdrawing employers as of the end of the year prior to the actual withdrawal of the employer from the Plan.  The dispute between the parties centers on whether the application of the changed actuarial assumptions here comply with the law.

Essentially, the C & S contended that as Penn Traffic withdrew in 2010,  the measuring year was 2009;  therefore, the Fund was held to the assumptions that it had in place at the end of 2009, not assumptions it purportedly initiated in 2010, the year of the Penn Traffic withdrawal.  C & S also contended that the rates used for minimum funding and withdrawal liability had to be one and the same.  The Fund raised various arguments in defense of its use of the changed assumptions.  It argued that C & S waived any objection to the rates used as it filed for arbitration beyond the date allowed by ERISA.  As to the merits, it argued that the same interest rates did not have to be used for minimum funding and withdrawal liability, and that the calculations achieved in 2010 could be applied retroactively.  All these arguments shall be set forth more fully in the section of the Opinion devoted to the positions of the parties.  Suffice it to say that if in fact the 2010 calculations are allowed, the purported liability of C & S would amount to approximately $64 million dollars.  If the Fund is limited to the 2009 actuarial assumptions,  the 8.5% rate of interest and the mortality table used in 2009, the amount of liability, as conceded by C & S in its brief, would be somewhere between $30,000,000 - $32,000,000.   The Fund however, as noted above, contended that the arbitration was filed in an untimely manner, and thus C & S is bound to the calculations asserted by the Fund in the Amended Proof of Claim filed with the bankruptcy court in the Penn Traffic bankruptcy.

## POST-HEARING DEVELOPMENTS

### THE DECISION IN METZ

First,  a decision was handed down in the case of National Retirement Fund et. al. vs. Metz Culinary Management, 946 F.3d 146 (2nd Cir. 2020),  17-1211-cv, (2d. Cir. 2020) where the issue squarely presented before me was presented to the Second Circuit.[12]  In Metz, the Employer, Metz Culinary Management, Inc. was a contributing employer to the National Retirement Fund, a multi-employer pension fund.  Metz was a member of the plan

---

[12]The attorney for C & S, Evan Miller, made the arbitrator aware of this post-hearing development by letter dated January 2, 2020.  The Fund was given an opportunity to review the decision and submit an additional brief; C & S was given an opportunity to reply to such brief.

until its complete withdrawal on May 16, 2014.  As a withdrawing employer, Metz had to pay its share of unfunded vested benefits (UVB's) pursuant to 29 U.S.C. Section 1381(b)(1).

For many years, the Fund in <u>Metz</u> had used an actuarial firm called Buck Consultants (Buck), and in October, 2013, Buck was replaced by the Horizon Actuarial Services Firm, (Horizon), the same firm as used by the Fund in the case before me.  The Buck firm had used an interest rate for several years of 7.25% as the discount rate in calculating the present value of the UVB's.  That rate was in effect in 2013.  However, in June 2014, the Horizon firm decreased the rate of interest for the calculation of UVB's from 7.25% to 3.25%.  As discussed earlier in this Opinion, Interest rates vary inversely with the present value of the pool of funds necessary to pay the UVB's; thus, the higher the discount rate used, the fewer funds are necessary in the present to create the future stream of benefits payable to pensioners.  Conversely, where you use a lower discount or interest rate, you must have a greater pool of funds at the outset to produce that same stream of benefits payable in the future, since such funds, according to the interest rate you have chosen, are not expected to earn as much money over time.

Because Horizon lowered the interest rate in 2014, and because it applied that lower interest rate to the Metz withdrawal in 2014, Metz's liability turned out to be much greater than it would have been had the rate used by the Buck firm been used there.  Had the 7.25% interest rate been used, Metz's liability would have been only $254,644.  Because the 3.25% interest rate was used by Horizon, the calculation grew to $997,734.  While ERISA requires actuarial assumptions to be "reasonable" (taking into account the anticipated experience and reasonable expectations), 29 U.S.C. Section 1393(a)(1), it also requires, under Section 1391, that such calculations be determined as of the end of the plan year prior to the withdrawal.[13]   The last date of the plan year prior to the withdrawal is called the 'measurement date' and in the <u>Metz</u> case, such date was December 31, 2013.  Accordingly, the parties placed the appropriateness of the withdrawal liability calculation before Arbitrator Ira Jaffe who ruled that the retroactive application of the 3.25% interest rate to a withdrawal which had occurred prior to the change in the rate of interest was improper.  Arbitrator Jaffe stated:

> The Fund's assertion that the Fund Actuary had not made any interest rate assumption determination as of December 31, 2013, for purposes of calculating the Fund's [UVB's] for withdrawal liability is rejected.   MPPAA requires that the assumptions and methods in effect on December 31, 2013, be used for calculating the Employer's withdrawal liability.  Absent

---

[13]The Court in <u>Metz</u> cited <u>Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.</u>, 513 U.S. 414, 417-181995), which in turn cited 29 U.S.C. Sections 1391(b)(2)(A)(ii), (b)(2)(E)(1), (c)(2)(C)(I), (c)(3)(A), and (c)(4)(A).  See 946 F. 3d at 148.

some change by the Fund actuaries, the existing assumptions
and methods remained in place as of December 31, 2013.[14]

In light of the Jaffe Opinion, the liability of Metz was substantially reduced.  The Fund appealed to the District Court, seeking to vacate Arbitrator Jaffe's award while Metz counterclaimed for enforcement.  The District Court reversed.[15]  The District Court found that ERISA did not require actuaries to make assumptions by the measuring date.  If, in fact, the actuaries have not affirmatively made determinations respecting their assumptions as of the measuring date, assumptions which are 'reasonable' and based on the actuaries' best estimate of anticipated experience of the Fund, then the practices or assumptions which happened to be in effect on the measuring date would not apply to a withdrawal occurring in the following year.  The Fund appealed to the Second Circuit which reversed the decision of the District Court.

The Second Circuit noted the issue before it was "whether, under the MPPAA, a fund may select an interest rate assumption after the Measurement Date and retroactively apply that assumption to withdrawal liability calculations." Metz, supra, at 150. The statute itself, at 29 U.S.C. Section 1393, ERISA 4213,  is silent as to whether interest rates for withdrawal liability must be affirmatively calculated as of the measuring date or simply rolled over to withdrawals in the following year. "Although the district court held that 'Section 4213 does not allow stale assumptions from the preceding plan year to roll over automatically,'  App'x at 278, there is no statutory or caselaw support for that proposition, and we do not agree with it." Metz, supra,  at 150. The Court further noted that Section 4214 of ERISA, 29 U.S.C. Section 1394, requires that Employers get notice of any plan changes or amendments regarding withdrawal liability.  Additionally, in examining the legislative history of the section, the Court noted that it was "designed to protect employers from the retroactive application of rules relating to the calculation of withdrawal liability." Metz, supra, at 150. "Although Section 4214 does not define 'plan rules and amendments' and Section 4213 –- unlike Section 4214 –- does not specifically address retroactivity, the retroactive selection of interest rate assumptions for purposes of withdrawal liability, as endorsed by the district court, is, therefore, inconsistent with Congress's legislative intent." Metz, supra, at 151.  Moreover ERISA permits employers to receive notice of their estimated withdrawal liability before actually withdrawing from a Fund.  See 29 U.S.C. Section 1021 (1)(1)(A) and (B) [16] "Such provisions are of no value if retroactive changes

---

[14]Appendix at 37.  Jaffe made the ruling in an interim opinion which apparently became part of the Final determination and award.

[15]Natn'l Ret. Fund v. Metz Culinary Mgmt., Inc. 16-CV-2408 (VEC) (S.D.N.Y. 2017).

[16] ERISA provides that "[t]he plan sponsor or administrator of a multiemployer plan shall, upon written request, furnish to any employer who has an obligation to contribute to the plan," a "[n]otice of potential withdrawal liability." 29 U.S.C. §

in interest rate assumptions may be made at any time." <u>Metz</u>, supra at 151. "We hold that interest rate assumptions for withdrawal liability purposes must be determined as of the last day of the year preceding the employer's withdrawal from a multiemployer pension plan. Absent any change to the previous plan year's assumption made by the Measurement Date, the interest rate assumption in place from the previous plan year will roll over automatically." <u>Metz,</u> supra, at 152.

<u>NEW YORK STATE TEAMSTERS CONFERENCE PENSION AND RETIREMENT</u>
<u>FUND vs. C & S WHOLESALE GROCERS, INC</u>., 5: 16-CV-84 (March 18, 2020)

Second, the United States District Court for the Northern District of New York concluded, on cross motions for summary judgment, that C & S was not a successor to Penn Traffic and thus was not liable for the withdrawal liability of Penn Traffic.[17]  <u>New York</u> <u>State Teamsters Conference Pension and Retirement Fund vs. C & S Wholesale Grocers,</u> <u>Inc.</u> , supra at ft. note 2 of this Opinion. However, the parties concluded that a determination by me on the amount of liability was still necessary in case the decision of the District Court were to be reversed by the Second Circuit Court of Appeals. The Fund indicated, in post-hearing telephone conferences, that it had every intention of appealing the decision of the District Court.

## **ISSUES PRESENTED**

1)Whether the arbitration was filed in a timely manner by C & S;

2)Whether the Fund erred in applying the changed actuarial assumptions to

---

1021(l)(1). The plan administrator is also required to provide:

(A) the estimated amount which would be the amount of such employer's withdrawal liability under part 1 of subtitle E of subchapter III if such employer withdrew on the last day of the plan year preceding the date of the request, and

(B) an explanation of how such estimated liability amount was determined, including the actuarial assumptions and methods used to determine the value of the plan liabilities and assets, the data regarding employer contributions, unfunded vested benefits, annual changes in the plan's unfunded vested benefits, and the application of any relevant limitations on the estimated withdrawal liability.29 U.S.C. § 1021(l)(1)(A)." <u>Metz</u>, supra, at 151.

[17]The Court had previously dismissed the Fund's claims that C & S was liable for the Penn Traffic withdrawal liability on the theories of common control liability, joint employer liability, or evade and avoid liability.  (See <u>Fund v. C & S</u>., supra at note 2, p. 4.  )

C & S, an alleged successor to Penn Traffic, where Penn Traffic withdrew from the Fund in 2010;

3)Whether the Fund is entitled to attorney's fees and costs.

## CHRONOLOGY OF EVENTS

| | |
|---|---|
| September, 2009 | Horizon begins to contemplate changing Actuarial assumptions to PBGC assumptions (TR-442) |
| November, 2009 | Penn Traffic Files for Bankruptcy (TR-769)[18] |
| December 31, 2009 | Actuarial assumptions for both Minimum Funding And Withdrawal Liability: 8.5% interest Rate and RP-2000 mortality table (TR- 233, 235) |
| December, 31, 2009 | PBGC rates for Mass Withdrawals: 5.3%; UP-94 mortality table (Ex. C-3, p.1) |
| April 18, 2010 | Fund files Proof of Claim in Penn Traffic Bankruptcy in amount of $27,609,115.72 (See Exhibit C-51). |
| May 7, 2010 | Goldfarb shares idea of changing actuarial Assumptions with Trustees (Ex. C-4) |
| May 15, 2010 | Penn Traffic withdraws from Fund[19] |
| June 22, 2010 | Brief discussion by Goldfarb at meeting with Trustees regarding assumption changes; (TR-445, 446, 450, 453) |
| June 23, 2010 | Breck Sherwood, colleague of Stan Goldfarb |

---

[18] The U.S. District Court for the Northern District of New York in the matter of the Fund vs. C & S, cited at footnote 2, supra, put the bankruptcy date as November, 2009. See p. 4 of the Opinion. Mr. DeBella testified as well that the bankruptcy was filed in November, 2009 (TR-769). Exhibit C-32, the Fund's Pre-Hearing Brief, puts the date at November 18, 2009. (C-32, p. 2).

[19]The employees of Penn Traffic continued to work in the warehouse until 2010. Accordingly, Mr. DeBella, on behalf of the Fund, took the position that the withdrawal of Penn Traffic took place in 2010 (TR-769).

|  | Of Horizon meets with Trustees to discuss Proposed changes to actuarial assumptions (TR-398-99). |
|---|---|
| September 10. 2010 | Fund completes amended proof of claim in Penn Traffic Bankruptcy for $64.212.061.21 (Ex. C-23) |
| January 22, 2016 | Fund files suit against C & S seeking to recover remaining unpaid withdrawal liability not paid by the Penn Traffic Estate (Ex. F-17) |
| October 23, 2016 | Demand for Arbitration filed by C & S with the American Arbitration Association |

## POSITIONS OF THE PARTIES

### THE TIMELINESS OF THE FILING OF THE DEMAND FOR ARBITRATION BY C & S

The burden rested with the Fund on this matter, as the timeliness, or lack there of, of the demand for arbitration, was asserted as an affirmative defense against C & S's demand for arbitration.  Accordingly, its position shall be set forth first.

### Position of the Fund

The Fund argues that assuming C & S was a successor employer to Penn Traffic, the Fund's claim in the bankruptcy of Penn Traffic, in 2010, started the clock running for C & S to file any claim for arbitration.[20]  It cites this arbitrator to  Chicago Truck Drivers v.

---

[20]The statutory provisions for questioning and challenging a Fund's estimate of withdrawal liability are set forth at 29. U.S.C.A. Section 1401, which states:

(a) Arbitration proceedings: matters subject to arbitration proceedings, procedures applicable, etc.

(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under section 1381 through 1399 of this title shall be resolved through arbitration.  Either party may initiate the arbitration proceeding within a 60-day period after the earlier of–

(A) the date of notification to the employer under section 1399(b)(2)(B) of this title, or

11

El Paso Co, 525 F. 3d 591, 601 (7th Cir. 2008),  holding that where employers are part of the same control group, the proof of claim against one is notice to the other control group members.[21]  Where the member of the control group did not file within the statutory time period, it was deemed to have waived any right to arbitration.  The waiver doctrine has been applied in a case involving a successor employer.[22]  Trustees of Utah Carpenters'& Cement Masons' Pension Tr. V. Daw, Inc. No. 2:07-CV-98 TC, 2009, WL 77856 (D. Utah Jan. 7, 2009). "The court drew no distinction between successor liability and controlled group membership for purposes of applying the waiver doctrine the Seventh Circuit articulated in Slotky and reaffirmed in El Paso."[23]

The Fund points out that C & S posits that this case is distinguishable from Daw, supra, because the employer in Daw did not seek arbitration.  This is a distinction without substance, according to the Fund.  The Court there specifically held that waiver occurred because the employer, DCG, "did not seek arbitration within 120 days after initially

---

              (B) 120 days after the date of the employer's
              request under section 1399(b)(2)(A) of this
              title.

         The parties may jointly initiate arbitration within the 180-day
         period after the date of the plan sponsor's demand under
         section 1399(b) (1) of this title.

[21] The Court cited its decisions in Central States, Southeast & Southwest Areas Pension Fund v. Slotky 956 F. 2d 1369, 1373 (7th Cir. 1992) and Trs. Of the Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Central Transport, Inc. 888 F. 2d. 1161, 1162 (7th Cir. 1989) for the proposition that a proof of claim in bankruptcy can constitute the requisite notice to and demand of an employer for payment of withdrawal liability under ERISA.  See 525 F. 3d. at 598.

[22]This arbitration went forward before the decision issued from the United States District Court for the Northern District of New York.  See footnote 2.  Therefore, any argument raised here must be dealt with on the assumptions put forth at the time of the arbitration which may affect the merits regarding the timeliness of the demand for arbitration or the amount of the calculation.   In sum, to reach my decision on the issues before me, I must presume that C & S is appropriately deemed a successor employer, notwithstanding the subsequent decision of the Northern District of New York.

[23] See Fund's Post-Hearing Reply Brief of August 12, 2019, p. 1. The Fund further points out that while its contention that C & S and Penn Traffic were part of the same control group was dismissed by the United States District Court for the Southern District of New York, that case is subject to appeal.  Ibid, p. 1. f.n. 1.

contesting that it should pay Daw's liability. <u>Daw</u>, 2009 WL 77856 at *4."[24]   No authority contradicts <u>Daw</u>, or otherwise supports the position of C & S.[25]

Moreover, C & S does not dispute it was on notice of 1) the Fund's Proof of Claims in the Penn Traffic Bankruptcy and 2) the potential claim of the Fund against C & S. Indeed, with respect to the latter, an entire fourth day of testimony was spent on whether or not C & S lawyers were verbally advised by Fund Counsel Vincent DeBella that the Fund had a potential claim against C & S for withdrawal liability. Mr. DeBella testified he had conversations with C & S representatives Rick Cobb and Kerri Mumford about preserving the Fund's "rights" and that he had specifically communicated to Cobb the "possibility that the Pension Fund would assert a successorship type of claim against C & S".  Similar conversations were held with C & S representative Mark Gross (TR - 784-85, 813).[26] At best, two of the C & S representatives simply could not remember whether or not they had such conversations. (TR - 944, 1029).  The third, Mr. Gross, while initially denying that such conversation took place, finally admitted that he had no recollection as to whether such conversations took place or not. [27]

Nonetheless, C & S  simply believes such awareness of the Fund's intent or of the proof of claims is irrelevant to a determination of the date for the timely filing for arbitration. C & S claims that the duty to seek arbitration arises only when the demand is made for payment, and such demand did not arise until 2016.   The Fund contends that this argument is precluded by <u>El Paso</u>, supra. In <u>El Paso</u>, the proof of claim started the time period running for the filing of any demand for arbitration, even though the additional defendants were not named in the proof of claim.  "Therefore it is immaterial that the 'proof of claim asserted liability against Penn Traffic...[and ] did not assert liability or demand

---

[24]Ibid, p. 2.

[25]The Fund also challenges C & S's reliance on the case of <u>Heavenly Hana LLC v. Hotel Union & Hotel Indus. Of Haw. Pension Plan</u>, No. 14-CV-03743-JCS, 2016 WL 524327 at *7 (N.D. Cal. Feb. 10, 2016).   C & S relied on this case for the principle that, were it found to be a successor, it would have the right at such time to initiate arbitration.  However,  in <u>Hana</u>, the arbitration resulted from a stipulation by the parties, not on a judicial determination of successorship.

[26]Fund Brief a p. 7.

[27]Gross asserted, however, that had such conversations taken place, he would have been involved in them, and therefore he would have recalled them.  (TR- 1062, 1064). The Fund says he contradicted his very own testimony on this point, saying that "he was confident he did not have conversations with Mr. DeBella based on the diametrically opposed reasoning that he *would not* have gotten involved. See id. At 1055, 1060, 1062".  Fund Brief at p. 8.

payment from C & S' ."[28]   Moreover, according to the Fund, El Paso did not rely on the common control of the defendants.  The control had been broken before the proof of claim was filed.  The Court in El Paso found that the defendants had *actual knowledge*[29] of the proof of claim, like C & S did here.  Therefore, the filing of the demand for arbitration in 2016 was, under ERISA, late.

Finally, C & S is not entitled to equitable tolling here, as it claims, under Bowers v. Transportation Maritima Mexicana S.A., 901 F. 2d 258 , 264 (2nd Cir. 1990).  Such tolling is permissible where "fraudulent or other conduct concealed the existence of claim." Id.[30] No such fraud exists here.  Moreover, Bowers and Banner Indus. Inc. V. Cent. States, Se & SW Areas Pension Fund, 875 f. 2d 1285, 1293-94 (7th Cir. 1989)[31] relied on by C & S both held that where a party has notice of a claim, merely acting promptly and decisively after the filing of the formal complaint against the party is insufficient to invoke the doctrine of equitable tolling.

## Position of C & S

C & S points out in its Post-Hearing Reply Brief that when a complete withdrawal from a Fund takes place by an Employer, the Fund has an obligation to notify the withdrawing employer of the amount of the liability, provide a payment schedule, and " 'demand payment in accordance with the schedule' 29 U.S. C. Section 1399(b)(1)."[32] The notice and demand triggers a 90 day period in which the employer may request review of the liability determination.  29 U.S.C. Section 1399 (b)(2)(A).  The Fund is given the opportunity to respond.  See 29 U.S.C. Section 1399 (b)(2)(B).  Then, either party may file for arbitration within 60 days of the earlier date of one of the following: A)the date of notification to the employer under section 1399(b)(2)(B), or B) 120 days after the Employer sent its request for review to the Fund. [29 U.S.C. Section 1401(a)(1) (A) and (B)]. Arbitration may be initiated jointly by the parties within 180 days after the plan's initial demand for payment. [29 U.S.C. Section 1401 (a)(1)(B)].

Here, the Fund did not notify C & S of its demand for payment until late January of 2016 when it filed a Federal lawsuit in the Northern District of New York contending that monies were owed by C & S to the Fund because C & S was a successor to Penn Traffic. Treating that lawsuit as a demand for payment, C & S submitted the appropriate request for review of the demand with the 90 day period referenced above, on April 26, 2016.

---

[28]Fund Brief at p. 3, quoting C & S Brief at p. 2.

[29]Emphasis supplied by arbitrator.

[30]See Fund Brief at p. 5.

[31]C & S Brief, p. 4.

[32]C & S Reply Brief, p. 1.

C & S further filed its demand for arbitration within the 180 day period required by the statute under 29 U.S.C. Section 1401 (a)(1)(B), by filing for arbitration on October 23, 2016.  "Under Second Circuit precedent, that was exactly the right way to handle the situation: If an employer is 'served with notice of its withdrawal liability in the form of the complaint,' then it must 'seek review and arbitration within 90 days of *receipt of the complaint*'.  Bowers v. Transportation Maritima Mexicana, S.A. 901 F. 2d, 258, 273 (2d Cir. 1990) (emphasis added.)"[33]

The Fund argues that the filing of the proof of claim in bankruptcy was notice to C & S, but that proof of claim was filed against Penn Traffic, not against C & S.  The proof of claim 'did not assert liability, or demand payment from C & S."[34]  When the proof of claim was filed, C & S was a third party who had no authority to file for arbitration under 29 U.S.C. Section 1399 or 1401.  "The Fund insists that C & S 'could have filed a demand for arbitration' in 2010 (Fund Br. 6), but it identifies no statutory provision that would have allowed that course - let alone *required* it - in the absence of a Fund demand for payment from C & S".[35]  Moreover, as the Fund admits, it only had a potential claim against C & S in 2010.  However, ERISA requires an employer to seek review within 90 days after a demand for payment, not within 90 days after awareness of a potential claim.

The two cases cited to the arbitrator by the Fund in support of its position regarding timeliness are inapposite.  In the El Paso case, supra, the employers were part of the same control group.  Thus, notice to one of the employers in the group was deemed notice to all and began the running of the statutory period in which to demand arbitration, See El Paso, supra at 600–01. As the employer who was part of the control group did not file for review or arbitration within the statutory time frame of ERISA, it waived its right to do so.  Here, however, Penn Traffic and C & S are not and never were part of the same control group.  Indeed, any such claim that they were so joined was rejected by a Federal court more than two years ago.  N.Y. State Teamsters Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc. 2017 WL 1628896 at *10 (N.D.N.Y. May 1, 2017).  "As a distinct employer, C & S was unquestionably entitled to a notice and demand for payment from the Fund *directed toward it.* That did not come until 2016."[36]

The Fund nonetheless argues that the waiver principle of El Paso applies as well in successorship situations, assuming C & S were found to be a successor to Penn Traffic, citing the Daw case, out of Utah, above. But, in Daw, the alleged successor never pursued arbitration. "In Daw, the waiver occurred because the alleged successor, DCG, 'did not demand arbitration or bring any action related to the notice of withdrawal liability to [the

---

[33]Ibid

[34]Ibid, p. 2.

[35]Ibid.

[36]Ibid, p. 3.

predecessor] *or the Trustee's later assertion that DCG should pay for Daw's liability.'* Id at *2 (emphasis added); see also Id at *4.  In other words, the alleged Daw successor *never* sought arbitration, even after the pension plan pressed its successorship theory.  Here, of course, C & S timely initiated arbitration after the fund first invoked successorship doctrine and demanded withdrawal liability from C & S in 2016."[37]

Even if the arbitrator were to accept the arguments of El Paso and Daw, she should nonetheless find that the time period for filing for arbitration should have been equitably tolled.  The Second Circuit has held in Bowers, supra, that the filing periods for arbitration under the Multi-Employer Pension Plan amendments to ERISA are subject to equitable tolling.  Bowers, supra, at 264.  Here, C & S acted 'decisively' and 'promptly' to protect its rights after the Fund served it with notice, via the lawsuit, that it was demanding payment of withdrawal liability from C & S.  See also "Banner Indus., Inc. V. Cent. States, Se. & Sw. Areas Pension Fund, 875 F. 2d 1285, 1293-94 (7th Cir 1989 )(granting equitable tolling where employer took immediate and affirmative steps to contest its liability.)"[38]

## INITIAL POSITIONS ON THE MERITS

### Position of C & S

C & S sets forth two broad arguments in its initial post-hearing brief.  First, it argues that in applying the PBGC rates instead of the minimum funding rates to the Penn Traffic withdrawal, the Fund violated the principles set forth in Concrete Pipe & Prods. of  Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal. 508 U.S. 602 (1993).  Second, it argues that the 2010 assumptions cannot be applied retroactively, as they were here.

As to the first issue, C & S notes "a withdrawing employer's liability is equal to its allocable share of the 'unfunded vested benefits' of the plan. 29 U.S.C. Section 1381(b)1."[39]  The UVB's equal the amount by which the anticipated benefits to be paid exceed the available assets with which they are to be paid. "Measuring a plan's UVB's therefore requires an estimate of the rate of investment return that the plan will earn in the future on its portfolio of invested assets."[40]In performing such measurements,  the actuaries must use actuarial assumptions that are "reasonable" and that "offer the actuary's best estimate of anticipated experience under the plan 29 U.S.C. Section 1393(a)(1)"[41] .  These requirements for the measurements are the same requirements for

---

[37]Ibid, p. 4.

[38]Ibid.

[39] C & S Post-Hearing Brief, p. 9.

[40]Ibid.

[41] Ibid.

the calculations of minimum funding.

Here, the 'best estimates' reached by the actuaries for calculations of minimum funding utilized an interest rate of 8.5% and an actuarial table for blue collar men, the bulk of the workforce employed here. These same measurements, therefore, should have been used for withdrawal liability. Yet, when it came to withdrawal liability, the actuaries shifted to the PBGC's rates and mortality table which grossly inflated the sums owed. Moreover, Congress has used the same statutory language regarding actuarial assumptions for minimum funding and for withdrawal liability. Generally, where a statute contains similar language in different sections, the language is read to have one meaning, citing this arbitrator to Smith v. City of Jackson, 544 U.S. 228, 233 (2005) (plurality opinion) and N.Y. Times Co. V. Newspaper & Mail Deliverers'-Publishers' Pension Fund, 303 F. Sup. 3d 23y6, 254 (S.D. N.Y. 2018).

C & S also contends that the reasoning of the Court in Concrete Pipe, supra, leads one to conclude that the same actuarial assumptions must be used in withdrawal liability as were used in minimum funding:

> The employer in Concrete Pipe argued that ERISA's rebuttable presumption in favor of the actuary's withdrawal liability calculations, 29 U.S.C. Sect. 1401(a)(3)(B), denied it an impartial adjudicator in violation of the Due Process Clause, by insulating the actuary's potentially biased assumptions from *de novo* review. Although the Court upheld the presumption, its reasoning for doing so compels that when an actuary calculates a plan's benefit liabilities - as it does for both minimum funding and withdrawal liability - the actuary must use consistent assumptions. The Court reasoned that 'the necessity for applying the same assumptions and methods in more than one context' means that 'the opportunity an actuary might otherwise have to act unfairly toward the withdrawing employer is 'limited.' 508 U.S. at 632. In particular, the Court noted that the need to adopt actuarial assumptions 'is not unique to the withdrawal liability context' as ' the statute employs identical language' to set forth 'the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements.' *Id.* Uniformity between these contexts 'check[s] the actuary's discretion' and thus eliminates the due process concern. *Id* at 633.
>
> In articulating this consistency principle, the Court specifically emphasized the need for uniformity with respect to discount rates. It stated that 'arguably the most important assumption' for withdrawal liability ' is the critical interest rate assumption

17

> *that must be used for other purposes as well.' Id (emphasis added)."[42]*

Here, the actuaries for the Fund readily admitted that the PBGC rates and mortality table which were utilized in calculating the escalated amount of withdrawal liability were not based on the anticipated experience of the plan's assets or the mortality of their covered employees:

> The Fund's actuary here *admitted* that in using PBGC discount rates he was forecasting not the anticipated experience of the Fund's actual investments, but instead the experience of a distinct *hypothetical* pool of assets the Teamsters Fund did not own, and was not expected to own.  And similarly, in using the UP-94 mortality table, the Fund's actuary admittedly forecast mortality based not on the anticipated experience of the actual population of the Fund, but rather on a mortality table that reflected a *hypothetical* population.  Such ersatz assumptions thus violated the statutory standard, which is an independent ground for arbitral relief.[43]

Here, the Fund's actuary admitted that the 8.5% rate used in the minimum funding calculations constituted his "best estimate" of the anticipated investment experience of the Fund over the long term (TR-232).  Despite this assertion, such a rate was not used in calculating the withdrawal liability for Penn Traffic.  "As the Fund's actuary conceded, '5.3% and 5.01% were not rates that represented [his] best estimate of the anticipated experience over the long term of the Teamster Fund's assets".[44]  Rather, they reflected the anticipated experience of a more conservative portfolio (TR - 253, 254).  "That was a direct and unequivocal concession that the Fund's actuary has violated the statutory mandate of Section 1393(a)(1)."[45]

---

[42]Ibid, p. 13.  C & S noted that since the decision in Concrete Pipe, supra, only 2 courts have considered the issue of consistency in interest rates when calculating minimum funding and withdrawal liability.  The first, N.Y. Times Co. V. Newspaper & Mail Deliverers'- Publishers' Pension Fund, 303 F. Supp., 3d 236, 254 (S.D.N.Y. 2018), found that one would expect the rates to be uniform, and a deviation from such a norm , presumptively could be viewed as unreasonable.  The second, Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund, 331 F. Supp. 3d, 365, 390-92 (D.N.J. 2018) rejected the argument but did not deal with the cited language of Concrete Pipe, supra.

[43]Ibid at p. 15 (emphasis in the original brief).

[44]Ibid

[45]Ibid at pp. 15-16.  Similar reasoning is applied to the mortality table used, which had nothing to do with the anticipated mortality of those covered by the Fund. [Goldfarb

The Fund's actuary attempted to justify his deviation from the withdrawal liability figure produced by using his best estimates of the Fund's anticipated earnings experience theorizing that withdrawal liability is a 'settlement'.  It is the Fund's 'one bite at the apple' to get a contribution to the shortfall from a withdrawing employer.  (TR - 271, 272). Through the use of more conservative assumptions, the Fund increases such employer's contributions should actuaries have erred in their calculations of anticipated earnings.  The Fund's expert, Mr. Harte, testified to a variety of considerations that ethically may be applied by actuaries in these circumstances, such as the purpose of the calculation (TR - 617, 618, 620), the health of the Fund, and the financial health of the Fund's employer/participants. (TR - 624, 626) However, such considerations violate the dicta in Concrete Pipe requiring consistency in the assumptions used and the requirements of 29 U.S. C. Section 1393 (a)(1) . If assumptions such as the health of the Fund come into play in calculations, they essentially should be accounted for in investment strategy:

> As Mr. Harte conceded, boards of trustees of multiemployer plans routinely take these factors into account in determining the long term investment strategy for the plan. (TR. 703-704). That strategy, in turn, derives the actuary's determination of a single investment return assumption that should not vary as long as the investment allocation strategy remains the same. In the case of the Teamsters Fund, once the trustees determined the investment allocation and the actuary determined that his best estimate of the investment return for the chosen allocation was 8.5% that should have been the end of the analysis.  For the actuary to proceed to then weigh factors relating to the financial health of the Fund in a manner that hypothesizes that the Fund's assets were invested more conservatively is an artifice that belied the reality of the trustee's investment allocation choices."[46]

As to the second issue, the retroactive application of the actuaries' calculations to Penn Traffic's withdrawal, C & S notes that it is "black letter law that an employer's withdrawal liability is calculated as of the last day of the plan year before its withdrawal. Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co., 513 U.S. 414, 417-18 (1995). Actuarial changes after that 'measurement date "do not bear on the employer's liability. See Combs. V. Classic Coal Corp., 931 F. 2d 96, 102 (D.C. Cir. 1991)."[47]  Yet, the Fund here did precisely that.  Such a decision cannot stand, and the Fund "should be

---

"conceded that 'the UP-94 table reflects the anticipated mortality experience of a hypothetical population' which included a large percentage of white collar workers." (Ibid at p.16, citing TR - 239 - 40.)]

[46]Ibid at p. 20.

[47]Ibid at p. 23.

ordered to recalculate Penn Traffic's liability using the discount rate and mortality table that were in effect as of December 31, 2009."[48]

## The Position of the Fund

Under 29 U.S.C. Section 1401(a)(3)(B), the calculation by the Fund of its unfunded vested benefit amount is presumed correct unless the challenging party can show that the actuarial assumptions were unreasonable.[49]   The reasonableness of the calculation is, under <u>Concrete Pipe</u>, to be considered against acceptability of the assumptions by the actuarial profession.    C & S failed in this burden, and failed, in its brief, to cite the testimony of its own actuary on this point or to cite any principles of reasonableness which it believes were contravened by the Fund.   Accordingly, it has "waived any potential challenge based on actuarial reasonableness."[50]

Further, the test here is not whether the actuarial assumptions of C & S's expert were more reasonable than those of the Fund's actuary.  Where a genuine difference of opinion exists among actuaries "ERISA's presumption of the Fund's actuarial correctness applie[s]. <u>Masters, Mates & Pilots Pension Plan v. USX Corp</u>., 900 F. 2d 727, 732 , 733 (4th Cir. 1990. Both Mr. Goldfarb, the Fund's actuary and Mr. Harte, the Fund's expert, testified that the withdrawal liability valuation is a 'settlement' and that the "PBGC rate is a reasonable settlement rate.  (TR - 336-37. 628-629)."[51] Indeed, Mr Egelberg, C & S's actuary testified that there was disagreement within the profession concerning the treatment of withdrawal liability valuations as a settlement.  (TR -163-164; Ex. F-4 at 4475-76).  As there is a mere disagreement within the profession, the evaluation reached by the Fund's actuaries must stand.  <u>Masters, Mates, & Pilots</u>, supra.

Additionally, in contravention of the argument of C & S, the change in assumptions was not retroactive to Penn Traffic.  The Fund distinguishes between the calculation of liability being made 'as of' the last day of the plan year preceding withdrawal, and 'by' the last day of the Fund year preceding withdrawal.  Calculations often cannot be made 'by' the last day of the plan year because the data on which such assumptions is made is often not available until a later date. In this part of its argument, the Fund refers this arbitrator to the decision of the District Court in the <u>Metz</u> case, infra.  The Fund continues:

> There is no basis to conclude that Horizon's decision to change assumptions in 2010 violated ERISA's requirement that the assumptions be made 'as of' the end of the prior plan year.

---

[48]Ibid at p. 24.

[49]<u>Concrete Pipe, supra at 635.</u>

[50]Fund's Post-Hearing Opening Brief, p. 9.

[51]Ibid.

> Indeed, to have done otherwise would be "ínconsistent with the actuary's obligations under ERISA Section 4213 as it would be difficult for an actuary to make her best estimate without knowing all the relevant data as of the Measurement Date. Metz, 2017 WL 1157156 at 9.[52]

Furthermore, there is simply no requirement in ERISA that the same actuarial assumptions be used for both minimum funding and withdrawal liability.  C & S points to no precedent in its brief on this point.  The weight of precedent is against such a conclusion.  See PBGC Opinion Letter 86-24, 1986 WL 38802 (Oct. 31, 1986) and Combs v. Classic Coal Corp., No. CIV. A. 84-1562 TPJ, 1990 WL 66583, at *5 (D.D.C. April 6, 1970).  C & S contends that these citations must be disregarded as to their precedential value in this regard for they predate Concrete Pipe, supra.  However, Concrete Pipe did not mandate that the assumptions in both incidences be identical. Rather, it noted that in both instances the assumptions must be reasonable and that such reasonableness was to be measured with reference "to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation." Concrete Pipe, supra at 635.  It is readily apparent here that the actuarial profession does consider it reasonable to use different assumptions in the context of withdrawal liability and minimum funding.[53]

C & S also argues that the interest rate used to calculate a Fund's investment return must be the 'best estimate' of the actuary's anticipated experienced under the plan. 29

---

[52]Ibid, p. 13.

[53]C & S's reliance on New York Times Company v. Newspaper and Mail Deliverers-Publishers' Pension Fund, 303 F. Supp 3d 236 at 254 (S.D. N.Y. 2018) is misplaced, according to the Fund.  C & S contended that the Court agreed with its view that a common interest rate and common assumptions are applied across the Board.  However, the Fund argues that C & S ignored the words of the Court that immediately followed the section it cited:

> That does not mean, however, that deviation is, at all times, impermissible by law - were that the case, the Court would not have included the open-ended 'could very well be' language rather than something more definitive.  While few courts have delved into the murky mists of these particular ERISA provisions, this Court is not the first to read Concrete Pipe in this way.  See Chi. Truck Drivers Helpers & Warehouse Workers Union (Indep) Pension Fund v. CPC Logistics Inc, 698 F. 3d 346, 355 (7th Cir. 2012)(Posner, J.) (discussing Concrete Pipe and observing that 'the Court [in Concrete Pipe] had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible."  Fund's Post Hearing Opening Brief, p. 16-17.

U.S.C. Section 1393(a)(1). Since 8.5% was the rate used for the investment return in determining minimum funding obligations, it must be used here. As noted above, such an argument has been overwhelming rejected in many jurisdictions. C & S claims that the argument here is distinct from the uniformity argument it raised above, because an actuary could shade its best estimate, making it more pessimistic, in one context and not another. "This is gobbledygook."[54] C & S had previously pointed out in its brief that actuaries could not " 'factor in a discount for conservatism.' " C & S Br. at 18 (quoting Wachtell, Lipton, Rosen & Katz v. Comm'r, 26 F. 3d 291, 296 (2d Cir 1994).[55]

Moreover, C & S and the Court in the New York Times case, (which ignored its own reasoning when finding a Fund improperly deviated from its minimum funding assumptions in calculating withdrawal liability, ignored the fact that the 'best estimate' standard is essentially procedural, "designed to insure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of the plan administrators or sponsors. Wachtell, 26 F. 3d at 296 (citing Vinson & Elkins v. Comm'r. , 7 F. 3d 1235, 1238 (5th Cir. 1993)."[56] Legislative history supports this conclusion.[57]

Finally, any argument challenging the change in the mortality tables is a red herring. If the arbitrator should find that the discount rate used to calculate withdrawal liability was permissible, there is no reason she should find the change in the mortality table used to be unreasonable or unlawful. Moreover, even if C & S were successful in convincing the arbitrator that the substitution of the new mortality table for the old was incorrect, such fact, standing alone, would not invalidate the calculation of withdrawal liability here. "...C & S may only rebut ERISA's presumption of correctness by demonstrating that the 'actuarial assumptions and methods used in the determination were, *in the aggregate,* unreasonable.

---

[54]Ibid, p. 18.

[55]Ibid.

[56] Ibid, p. 19. Additionally, the Fund points out that this Arbitrator herself essentially rejected C & S's view that the best estimate requirement mandates common assumptions for minimum funding and withdrawal liability, and her views were upheld by the District Court. Miller & Son Paving, Inc. v. Teamsters Pension Tr. Fund of Philadelphia, No. CV 1504869, 2016 WL 4802752 at *6 (E.D. Pa. Sept. 14. 2016). {"[The Court] find[s] the Fund's use of the blended rate to calculate withdrawal liability consistent with ERISA]]....As [Arbitrator Mariann Schick] found, if after 2008 the Fund had continued to use a 7.5% valuation rate to calculate withdrawal liability, this would 'have been going against its best estimate of what interest rate calculations would best serve a fund in an unhealthy status.'Op.22. This would have been inconsistent with ERISA's requirement that withdrawal liability be based on assumptions that 'offer the actuary's best estimate of anticipated experience under the plan.'"}. See Fund's Post-Hearing Opening Brief, p. 21.

[57]Ibid, p. 20.

29 U.S.C. Section 1401(a)(3)(B).  C & S offered no evidence that the change in mortality assumptions, by itself, rendered the overall calculation unreasonable 'in the aggregate'. Indeed, C & S has conceded the change in mortality assumptions was relatively inconsequential., see C & S Pre-Hearing Br. At 2 n.2...[58]

## THE IMPACT OF THE DECISION IN METZ

C & S submitted a letter to this arbitrator dated January 2, 2020 after the Metz decision, supra, was handed down.  Counsel for C & S noted that Metz presented legal issues which were identical to those before this arbitrator, namely "whether a pension plan can calculate an employer's withdrawal liability using an interest rate assumption that it adopted *after* the 'measurement date' applicable to that employer's withdrawal."[59]  The decision of the Second Circuit, according to Counsel,  held that a Fund is not permitted to do so, and this decision was dispositive of the matter before this arbitrator:

> Second Circuit authority is binding on issues of law.  And there is no dispute, as a factual matter, that the Fund's actuaries in this case changed the withdrawal-liability interest rate assumption sometime in 2010 - *after* the 'measurement date' of December 31, 2009...Accordingly, under Metz, Penn Traffic's withdrawal liability must be calculated using the interest rate assumption that was in place on December 31, 2009 - which rate was 8.5%.[60]

The Fund was given an opportunity to review the case and respond, and then C & S was permitted to submit a response.

## The Position of the Fund

First, the Fund argues that the Metz decision in no way alters its argument that the arbitration here was filed in an untimely manner.  Since the arbitration is untimely, C & S is held to the withdrawal liability assessed against it by the Fund.  Thus, this arbitrator need not consider the application or implication of the decision in the Metz case.

Second, the Metz decision cannot be applied retroactively.  Per federal law, an opinion can only be given full retroactive effect to cases "still open on direct review....Harper

---

[58]Ibid, p. 23.

[59]Jones Day letter to Arbitrator of January 2, 2020, p. 1., emphasis in the original. See attached Exhibit A.

[60] Ibid.

v. Virginia Dep't of Taxation, 509 U.S. 86, 97 (1993)."[61]  The Fund continues:

> C & S's demand for arbitration cannot meet the requirement of a case 'still open on *direct review*' because the withdrawal liability assessment was already resolved between the Pension Fund and Penn Traffic and was the subject of a final court order in 2010.  See Ex. C-24.  While an appeal of that order could have potentially constituted 'direct review', a second new proceeding brought by C & S, after the entry of that final court order, certainly does not.[62]

Third, the Fund argues that the assumptions applied by the Fund during 2010, the year of the Penn Traffic withdrawal, were consistent with the Fund's rules which were agreed to by Penn Traffic and C & S and endorsed by the Second Circuit in Metz.  The Fund points out that with respect to withdrawal liability its own plan rules provide " 'the actuarial valuation for a Plan year ending on December 31 will be finalized during the immediately following calendar year.' Ex. C-40, Section 6(c).' "[63]   There was no such plan rule at issue in Metz. "Accordingly, even if you determine that Horizon's decision to change assumptions in 2009 was not effective until it was applied to withdrawing employers in 2010, this timing was contemplated by the Pension Fund's rules."[64]  Moreover, Metz does not trump the Fund's rules:

> "In Metz, the Second Circuit analogized the plan's change in assumptions to a new plan rule and emphasized that plan rules with respect to withdrawal liability are not only permissible, but that they may even be applied retroactively with 'the employer's consent'.  Metz, 946 F. 3d at 150 (quoting H.R. Rep. No. 96-869, pt. 2 at 30)[65]

---

[61] Fund's Response to C & S Wholesale Grocers, Inc. Notice of Supplemental Authority of January 24, 2020, p.3.

[62]Ibid.

[63]Ibid. Exhibit C-40 is the Fund's Policies and Procedures for Contributing Employers.

[64]Ibid.

[65]Ibid.  In footnote 2 of its submission, the Fund also draws this arbitrator's attention to Artistic Carton Co. v. Paper Indus. Union-Mgmt. Pension Fund, No. 90 C 2727, 1991 WL 28218, at *1, 5 (N.D. Ill. Feb. 26, 1991), rejecting the argument " 'that even if they are bound to the Fund's liability rules, those rules are contrary to statute, ambiguous, unconscionable, and therefore unenforceable,' because' [t]he statutory imposition of withdrawal liability is not intended to restrict the parties'; freedom to agree

This retroactive application of assumptions set forth in the Plan's Policies and Procedures was agreed to by the employers when they executed the Fund's participation agreement, which, by its very language, holds employers to all the rules and regulations of the Fund.[66]

     Fourth, the actuaries here had decided to change the actuarial assumptions prior to the measuring date.  Even if the decision was not implemented, the dye was essentially cast. The decision was put off until 2010 because Mr. Sherwood told Mr. Goldfarb of Horizon that the assumptions had already been determined for 2009, and the first assessments for withdrawal liability had been sent out.   "Accordingly, the dispositive issue is whether Metz requires that, in order for an actuary to be deemed to have selected assumptions in 2009, the actuary must have applied those assumptions to a withdrawal occurring in 2009."[67]  The Fund argues that Metz prohibits such a result:

> Not only does Metz not require the actuary to apply the new assumptions to a withdrawal occurring in 2009, Metz prohibits the actuary from doing so.  See Metz, 946 F. 3d at 151 (prohibiting the application of an interest rate assumption "which was "select[ed] ...after the Measurement Date").   The Measurement Date for withdrawals occurring in 2009 was December 31, 2008.  Under Metz, an actuary is required to - exactly as Horizon did here - wait until the following year to apply the new assumptions to withdrawing employers.  Indeed, had Mr. Goldfarb not followed Mr. Sherwood's advice to wait to apply the change with respect to withdrawals in 2010, and instead proceeded with implementing the changed assumptions to 2009

_____

to additional or supplemental measures to protect a plan from the consequences of an employer's withdrawal' and [t]he employer may not now escape its contractual obligations by complaining that the Fund's provision are in conflict with the liability limitations contained in ERISA') (quoting Rep. Frank Thompson, Jr. 126 Cong. Rec. 23,039 (1980)]" See footnote 2.

[66]The Participation Agreement provides in Section 1(a):

> 1.(a) This Participation Agreement, executed by the undersigned Teamsters Local Union (hereinafter 'Union') and Employer, is the basis for participation in the New York Teamsters Conference Pension & Retirement Fund (hereinafter 'Fund').  The Employer, its participating employees, and the Union, as a condition of participation in this Fund, are bound by all of the rules and regulations of the Fund now and/or hereafter adopted. (See Exhibit C-23, at p. 126802764074).

[67]Fund's Response to Notice of Supplemental Authority, p. 5.

25

withdrawals, as he initially 'want[ed] to do,' TR. at 442, that would have violated <u>Metz</u>."[68]

Finally, should the arbitrator find that the assumptions in existence as of the measurement date must be applied under <u>Metz</u>, then such assumptions must also be applied to the valuation of the Fund's assets and liabilities.  In other words, if the interest rate assumption in effect as of the measuring date, 8.5% is to be used, then the mortality tables must also be used.[69]  Similarly, the valuation of the assets and liabilities as of the measuring date must be used, and not valuations determined in 2010 after all the investment numbers from the prior years are received. (See Exhibit C-14).   Here, Mr. Egelberg, the Employer's actuary, calculated the withdrawal liability of C & S using actuarial valuations which were not made prior to December 31, 2009.  (See Exhibit C-1 at p. 13).  He used the 2009 figures obtained in 2010.  Under <u>Metz</u>, however, the 2009 actuarial valuations should be used, and such an application would increase the actuarial valuations above what was originally assessed against Penn Traffic, and hence against C & S.

The Response of C & S

First, C & S contends that the all the new arguments of the Fund have been waived or conceded.  The Fund's post-hearing arguments indicated that <u>Metz</u> governed the outcome, but relied on the decision of the District Court which supported the decision of the Fund here: to utilize assumptions effected after the measurement date. The Second Circuit, however, rejected such actions, and now the Fund seeks to raise new arguments.  First, it argues that <u>Metz</u> no longer is the governing principle, that the Fund's policies nevertheless permitted the result here, and that, in fact, the actuary made the decision to change the interest rates in August or September 2009, even if they were not applied until 2010.  The Fund made these arguments for the first time after the Second Circuit's decision, even though they had every opportunity to do so during its first post-hearing submission, in case the Second Circuit reversed.  "Failure to raise an argument in one's brief waives that argument.  See <u>Norton v. Sam's Club</u>, 145 F. 3d 114, 117 (2nd Cir. 1998).  And the Fund 'cannot now raise' points previously 'conceded'.  <u>United States v. Fahey</u>, 510 F. 2d 302, 305 (2nd Cir. 1974)....The Arbitrator should therefore simply confirm that <u>Metz</u> now takes C & S's side on the only legal issue the parties debated in their post-hearing briefs, and sustain C & S's retroactivity challenge."[70]

The Fund's new arguments also have no merit.  The Fund argues that the decision in <u>Metz</u> in 2020 cannot reverse a calculation of withdrawal liability in 2010.  However, in its

---

[68]Ibid, p.6.

[69]Indeed, this arbitrator by email of January 6, 2020, asked the parties to be prepared, in an upcoming telephone conference, to discuss whether or not the holding of <u>Metz</u> would be applied to mortality tables in addition to the interest rate.

[70]Supplemental Reply Brief for Claimant, p. 4.

initial Post-Hearing Brief, the Fund relied on the decision of the District Court in <u>Metz</u> in support of its position. (See Fund Post-Hearing Brief at p.11).  If as the Fund vigorously argued, the district court's decision could be retroactively applied to a 2010 withdrawal, then surely the appellate court's decision in the same case also can be applied to the same 2010 withdrawal."[71]  Moreover, the argument of the Fund on this point is frivolous.  This arbitration is an open case which, in all likelihood, will be subject to review by the Federal Courts after the arbitration decision is issued. "As the Fund admits, a 'controlling interpretation of federal law' must be 'given full retroactive effect in all cases still open on direct review.' <u>Harper v. Va. Dep't of Taxation</u> 509 U.S. 86, 97 (1993)."  This arbitration falls within the category of cases referred to in <u>Harper</u>.

The Fund argues that even if the retroactive assumptions violate ERISA, they comply with the Fund's own rules, which sanction such retroactivity. Moreover, the rule referred to merely states that actuarial evaluation for a plan year ending December 31 will be finalized in the following calendar year. This is a legitimate practice which is often needed as financial information is not available until after the year's end. C & S disagrees.  First, pension plan rules cannot violate ERISA.  <u>Esden v. Bank of Boston</u>, 229 F. 3d 154, 173 (2d Cir. 2000). Second, the timing of actuarial evaluations is not the issue here:

> <u>Metz</u> does not speak to when 'actuarial valuation' reports should be 'finalized'.  What it holds is that, in calculating withdrawal liability, an actuary must employ the *assumptions* that had been selected and were in place at the end of the prior year, and that those prior assumptions continue in force until they are affirmatively changed.  C & S is not objecting to the timing of the finalization of the Fund's **valuation report**, it is objecting to the Fund's retroactive use of ***actuarial assumptions.*** Nothing in the plan rules allows that.[72]

Lastly, the Fund argues that the actuarial assumptions were actually made in 2009 even though they were not effectuated until 2010.  This contravenes the position the Fund has taken throughout the proceedings:

> In its post-hearing brief, the Fund repeatedly admitted that the actuary did not change the assumptions until 2010.  It said that Horizon 'waited until May 2010 before formally advising the Pension Fund of its intent' to change assumptions. (Fund Post-Hearing Br. 3).  It conceded the 'change in assumptions' occurred 'during 2010.'  (Id. At 11) And it argued that, as a matter of law, 'Horizon's decision to change assumptions in 2010' did not violate ERISA. (Id at 12)....The Fund's attempt to

---

[71]Ibid, p. 5.

[72]Ibid. Emphasis in C & S's submission.

argue facts contrary to its own admissions in its own post-hearing brief should be squarely rejected.[73]

In any event, Metz requires that the change actually be made before the measuring date, not simply intended.  See Metz, supra at 152.  Further, the evidence shows that the minutes of the Fund meeting in June, 2010 indicated that Horizon advised of a 'proposed' change in the actuarial assumptions for withdrawal liability.  (Ex. C-12, p. 9).  "If the change was only 'proposed' as of June 2010, and subject to further review, then the change was certainly not 'made' before the end of 2009.[74] C & S also stated the following:

- In July, 2010, a Horizon consultant sent an internal email noting that, per the Fund administrator ("Kenny"), a Fund lawyer wanted to 'run the idea [of the new assumptions] past the three other trustees' and get 'their sign off' before letting Horizon proceed. (EX. C-17).  Since that 'sign off' had not yet taken place, clearly the change had not yet been made; it was still just an 'idea';

- On August 2, 2010, Goldfarb sent an email stating that he was '*recommending* a change in the assumptions' and advising that it is *now* appropriate to make that change. (Ex. C-9) at 2 (emphasis added).)  If the actuary *recommended* the change in August, 2010, he could not have *already made it* the year before.

- Three days later, the Fund administrator responded to Goldfarb that he had '[j]ust received approval' from the employer trustees 'that they are fine with *moving forward* on the new EWL assumptions as recommended by Horizon.' (Ex. C-2).  (emphasis added).)  If approval to 'move forward' was not given until August, 2010, obviously the change was not made before that.

- On October 8, 2009, the Fund published an actuarial valuation for the 2009 plan year. (Ex. C-25).  In the section identifying any "changes in Assumptions and Methods Since Last Actuarial Valuation," the Fund actuaries did not say they had changed the withdrawal-liability interest rate or mortality tables.  (Id. At 29.)  That confirms that the change was *not* made before October 2009.  Rather the actuarial change is memorialized only

---

[73]Ibid, p.7.

[74]Ibid.

in documents from *August 2010 onward*, establishing that as the date of the change. (E.g., Ex. C-3 at 3.)

• In April 2010, when the Fund filed its first proof-of-claim in the Penn Traffic bankruptcy, it demanded only $26.9 million in withdrawal liability. (Exc. C-51 at 2.) When the Fund *amended* its claim in September, 2010, it increased it to $63.5 million. (Ex. C-23 at 9). The change, according to Fund witnesses, was based in part on the intervening 'change in the actuarial assumptions.' (TR. 765.) This definitively proves that the change occurred after April 2010.

• At the hearing, Breck Sherwood of Horizon testified that 'the change in the assumptions was started' by Goldfarb's email in 'May' of 2010. (TR 437). And Goldfarb himself agreed that 'in 2010, two assumptions were changed,' and that 'in 2010, [he] changed' the interest rate assumption. (TR. 234, 246). The record is full of similar references from Fund witnesses, to the changes in '2010.' (E.g. TR 291, 34, 341, 390, 410, 430, 757, 766, 831).[75]

The overwhelming evidence shows that the assumptions were changed in 2010. <u>Metz</u> mandates that the change in assumptions be made before the measuring date, not that such changes merely be ideas " 'raised' in the hallways of the actuarial firm before the Measuring Date."[76]

As to the Fund's final assertion, that the value of the Fund's assets and liabilities must be recalculated as of the measuring date, such action is not necessary and is indeed "misguided".[77] C & S challenged two actuarial assumptions: the interest rate and the mortality tables. It did not challenge the valuation of assets. "The Fund cites nothing for the notion that a pension plan may use an employer-initiated arbitration as an excuse to change other aspects of its assumptions that were never challenged by the employer.

Here, assumptions were challenged by the Employer. But, the state of the pension fund as of the measuring date depends not only on assumptions but on facts as well. Some of those facts may not be known until a later date after data is collected. Yet, as long as the facts are determined as of the measuring date, even if they are garnered at a later date, no violation of ERISA results. Horizon did exactly that: it gathered data in 2010 and performed

---

[75] Ibid, p. 8.

[76] Ibid, p. 9.

[77] Ibid.

a calculation in 2010, that created a valuation for the plan assets as of December 31, 2009. "By contrast, using data from an earlier valuation, as the Fund now suggests should be done, would be plainly wrong, as that date reflects the value of plan assets as of December, 2008. (See Fund Supp. Opp. 8-9 & n.9)."[78] Moreover, the parties have already agreed to the reduced figure of liability should the arbitrator sustain C & S's challenge to the amended calculation of withdrawal liability, $30.267 million.

## THE FUND'S ENTITLEMENT TO ATTORNEY'S FEES

### Position of the Fund

The Fund argues that it is entitled to fees because C & S unnecessarily protracted the hearing.  The Fund points out that C & S argued that it is per se illegal to utilize different assumptions for withdrawal liability and minimum funding.  That is a wholly legal issue which did not necessitate days of hearing.  Its actions thus caused the arbitration itself to be unnecessarily protracted, citing S. City Motors, Inc. V. Auto. Indus. Pension Tr. Fund, No 17-CV-04475-JST, 2018 WL 2387854, at *7 (N.D. Cal. May 25, 2018).  The Fund claims it is entitled to an award of its fees and costs respecting at least 2 days of hearing.

Indeed, the Fund has a legitimate claim to payment for its fees and expenditures for all four days of hearing because C & S had previously taken the same legal position in a case before Arbitrator Sheinman.[79]  Both the Opinion of Arbitrator Sheinman and the transcript of that proceeding were placed in the record before this arbitrator.  Therefore, the days spent on hearing in the instant matter were totally unnecessary. Further, C & S had every motive to protract the hearing in order to delay its day of reckoning as a successor. First, if the District Court had issued or were to issue its decision finding C & S to be a successor employer, C & S could delay payment of the monies until such time as the arbitrator  ruled.  Additionally, it has indicated that it has every intention of appealing the decision of the arbitrator should it lose before this arbitrator.  Thus, delay must have been the motive behind C & S's insistence on the extensive days of hearing.

### Position of C & S

The request by the Fund for attorney's fees and costs is frivolous.  First, C & S initially wanted to wait until a ruling came down from the District Court in New York concerning C & S's status as a successor employer to Penn Traffic.  Nonetheless, when the arbitrator determined that the case had to move forward, C & S moved forward in good faith.  It had no desire to seek any delays in the ruling by the arbitrator as her ruling would not take effect "unless and until" the federal court found that C & S was a successor to Penn Traffic.[80]

---

[78] Ibid, p. 10.

[79] See Exhibits F-4 and F-14.

[80] C & S Reply Brief, p. 10.

Second, C & S did not raise baseless arguments as argued by the Fund.  The retroactivity argument was pending in the Second Circuit court of appeals in the <u>Metz</u> case, supra, as the parties tried the instant case before arbitrator Schick.  As to the challenge to actuarial assumptions, C & S had "strong documentary evidence" which led it to believe that the Trustees had interfered in the setting of the actuarial assumptions. E's. C-4; C-12 at 9; C-9 at 2.  C & S was entitled to try to develop that record with live testimony; its ultimate decision to abandon the argument strongly reflects *good faith.*[81]  C & S was not required to rely on testimony from a prior proceeding , which was an entirely different case, and which, the "Arbitrator already made clear is 'not ...material to me'."[82]  Finally, the last day of testimony was required by C & S in order to rebut the testimony offered by Mr. DeBella of the Fund.  For all these reasons, C & S cannot be held responsible for the Fund's attorney's fees and costs.

<u>DISCUSSION</u>

I. <u>The Demand for Arbitration was Timely</u>

As shown above, C & S filed its demand for arbitration on October 23, 2016, about 7 years after Penn Traffic, the original employer in this case, went into bankruptcy.     The Fund, relying on the <u>El Paso</u> and <u>Daw</u> cases, supra, contends that C & S should have filed for arbitration within the requisite 270 days after the filing of the Fund's claim in bankruptcy. Having reviewed the cited cases, I am not persuaded that in the circumstances of this case, C & S should have been required to file for arbitration in or about 2010 after the initial claim in bankruptcy was filed against Penn Traffic.

In <u>El Paso</u> the Chicago Truck Drivers, Helpers and Warehouse Workers Pension Fund filed a claim against various employers (El Paso CGP Company, El Paso Midwest Company, El paso CNG Company, LLC, American Natural Resources Company and ANR Advance Holdings, Inc. for withdrawal liability.  The Union had a collective bargaining agreement with a Company called ANR Freight System Inc. which required ANR Freight to contribute to the Pension Fund.  ANR Freight was a wholly owned subsidiary of Coastal Corporation (Coastal), an oil and gas company.  Coastal controlled ANR Freight through a series of intermediate companies, and through 1995 , there was no dispute that  Coastal and the intermediate companies they owned and controlled, including ANR Freight, constituted a 'controlled group' which the Court dubbed the Coastal group.[83]

In 1995, the Coastal Group arranged for a merger of its ANR Freight Company with

---

[81]Ibid.

[82]Ibid.

[83]Coastal became El Paso CGP Company; another company, Coastal Natural became El Paso CNG Company, L.L.C., and another company (ANRF's) holdings were merged with El Paso Midwest Company.

a trucking company, Advance Transportation Company (ATC) which was owned by one of its employees and individual shareholders.  The merged company was called ANR Advance Transportation Company (ANR Advance), one of the Companies named in the suit for withdrawal liability.  As a result of this merger "ANR Advance was no longer part of the Coastal Group because the Coastal Group no longer owned 80% or more of ANR Advance's stock." at 596.  ANR Advance continued contributing to the Fund, but on February 2, 1999, an involuntary Chapter 11 bankruptcy was filed against ANR Advance, and the bankruptcy was converted to a Chapter 7 bankruptcy on June 3, 1999.  The Proof of Claim by the Fund was also filed on June 3, 1999.  The Fund filed its proof of claim which referenced withdrawal liability, listed the amount the Fund had assessed and included a payment schedule.  At the time the claim was filed, the Bankruptcy had been converted to a Chapter 7 bankruptcy, and such bankruptcies are administered by Trustees.  Thus, it is the trustee who receives the proofs of claims filed in the bankruptcy, and the trustee here never advised ANR Advance that the Fund's claim had been filed.  However, in doing due diligence in another case, a lawyer for the defendants in the lawsuit in El Paso discovered the proof of claim but sat on his hands and did nothing.  The Fund also sat on its hands and did nothing to initiate a suit to collect the withdrawal liability.  Finally on November 18, 2004, more than 5 years after the original proof of claim had been filed in the ANR Advance Bankruptcy, the Fund sent a letter to the Defendants with a Notice and Demand for payment.  A new schedule of payments was also attached.  The Defendants requested review on February 15, 2005, and on August 5, 2005, the defendants demanded arbitration.  In the meantime, on December 6, 2004, the Fund initiated the suit to collect the withdrawal liability.

The Fund contended that the June 3, 1999 proof of claim constituted the requisite notice under the statute to start the statutory clock running for arbitration.  Under this theory, the demand for arbitration in August, 2005, would have been untimely.  However, if the November 18, 2004 letter to the Defendants constituted the statutory notice and demand for payment, then the demand for arbitration was timely.  "...[T]he Defendants' statutory duty to arbitrate is not triggered initially until they receive a proper notice and demand." at 597.  The Court continued:

> The district court thus correctly stated that, to prevail on a collection claim, the Fund must show that (1) 'the Fund was a multiemployer pension plan and the Defendants were the employer for the purpose of ERISA,' (2) 'the Fund notified the Defendants of their assessed liability,' and (3)'Defendants failed to timely initiate arbitration.'  Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep) Pension Fund v. El Paso GCP Co., No. 04 C 7872, 2006 WL 1037152 at *4 (N.D. Ill. April 17, 2006).[84]

The Court pointed out however, that at the time the bankruptcy was filed, the Defendants here were no longer the members of a common controlled group.  They were

---

[84] El Paso, supra, at 597.

former members. The court noted:

> In essence, the Fund asks us to extend the constructive notice principle to include notice to *former* members of the controlled group. Such an application of the constructive notice principle is unprecedented in this circuit. In the cases we have examined in which the constructive notice principle has been applied, the employer has always been a member of the then-existing controlled group. See e.g. <u>Central States, Se & Sw. Areas Pension Fund v. Nitehawk Exp. Inc</u>. 223 F. 3d 483 (7th Cir. 2000), <u>Slotky</u>, 956 F. 2d at 1375, <u>Central Transport</u>, 888 F. 2d at 1163-64, <u>IUE, AFL-CIO Pension Fund v. Barker & Williamson, Inc.</u>, 788 F. 2d 118 (3d Cir. 1986). The Third Circuit, the only other circuit court to consider the issue, balked at such an extension of the constructive notice principle. See <u>Kero Leasing</u>, 377 F. 3d at 298-99 & n. 10....
>
> In the instant case, the Defendants retained an ownership interest in ANR Advance after the merger and loaned the company a substantial amount of money. But, it is not difficult to imagine a case in which the relationship between current and former members of a controlled group is distant or indeed, non-existent. In those cases, the practical justification for recognizing the application of a constructive notice principles loses much of its force"[85]

Nonetheless, the Court in <u>El Paso</u> imposed liability because indeed the notice, which was set forth in the proof of claim, did eventually get to the Defendants. In answer to the Fund's interrogatories, the Defendants admitted that their lawyer had discovered the proof of claim and that they became aware of it no later than January 1, 2002. It is this latter date that started the arbitration clock running. "Nothing more is required if the Notice and demand contains the necessary information, as this one did."[86] The defendants were not entitled to ignore the knowledge they had.

---

[85] Id. at 599 - 600. The Fund also contended that the notice was proper because of its claim that the merger was done to evade or avoid withdrawal liability, and thus the transaction would be voided. However, the Court noted that in the 'evade or avoid' cases it examined, the issue was the legitimacy of the transaction, not the adequacy of the notice. "Using the 'evade or avoid' provisions to *establish* notice could have troubling consequences; those courts that have addressed the argument have thus rejected it. (Citations omitted), Id at 600. There is no contention in the case before the undersigned that there was any action by Penn Traffic or C & S to evade or avoid withdrawal liability.

[86] Id. at 600

In the instant case, the Fund does not contend that the Employer here was in a common control group, at any time, with Penn Traffic.  Nonetheless, it cites this case for the principle that knowledge of notice can be imputed to one in a control group, and that indeed, such a principle has even been extended to one who could be viewed as a successor, citing Daw.  In the instant case, there was no relationship between C & S and Penn Traffic in terms of common ownership before the bankruptcy although C & S did business with Penn Traffic.[87] It also was a creditor of Penn Traffic during the bankruptcy. At the time the initial proof of claim was filed by the Fund in April, 2010, the claim was filed not against C & S but against Penn Traffic.  By contrast, in El Paso, supra, the proof of claim was filed against the very employer from whom the fund sought payment.

Moreover, it does not appear that C & S even arguably had the indicia of successorship in April, 2010 such that it should have taken the filing of a claim in bankruptcy against Penn Traffic as the requisite notice *to it* to initiate arbitration should it wish to challenge the amount of withdrawal liability claimed in the filing.  There was no evidence in the record before me that either before or after the Penn Traffic Bankruptcy, C & S hired the same workforce, used the same management or the same equipment, or operated out of the same location as Penn Traffic. (cf Daw, supra, p. 3. )[88]  Thus, there was nothing in place in April, 2010, or indeed thereafter, that should have placed C & S on notice that, on a viable legal basis, it could be viewed as a successor.[89]  The Court in El Paso said it was loathe to find that a proof of claim in bankruptcy against one member of a *former* control group sufficed to give knowledge of the claim to the other former members.  Indeed, the Court did

---

[87] See F-21, CS_PT - 000113419, and footnote 88, infra.

[88] To the contrary, the District Court indicated C & S purchased certains assets of Penn Traffic around 2008, before the bankruptcy, and then subcontracted with Penn Traffic to provide certain services to it, also around 2008.  Moreover, C & S took over only 30% of the customers serviced out of the warehouse in Syracuse which employed the members covered by the plaintiff Fund. The Court also found that after the 2008 transactions, Penn Traffic continued to own the equipment. See New York State Teamsters Conference Pension and Retirement Fund v. C & S Wholesale Grocers, Inc., 5:16-CV-84, p.3, 11-13 (2nd Cir. 2020).

[89]This arbitrator is well aware that the question of C & S's status as a successor was never before her.  Such a matter was for the courts, and the District Circuit issued its decision on this question after the hearings concluded.  Nonetheless, for the arbitrator to determine whether the bankruptcy filings constituted a sufficient form of notice to C & S of its possible liability under ERISA as a successor, she would have had to see some facts in the record before her to find that C & S, at least arguably, could be viewed as a successor.  If it arguably could be viewed as successor, then arguably, under Daw, supra, the proof of claim could have constituted a notice of demand for payment of withdrawal liability, thus starting the arbitration clock running. Yet, such facts were lacking here. The burden rested with the Fund to complete the record on this point, and with respect to this particular issue, it did not meet its burden.

not find notice to the former control members on such a basis.  If a Court would not impute knowledge of responsibility for withdrawal liability under such circumstances to former members of a control group, I doubt it would impute knowledge in circumstances such as those before me where the indicia of successorship, at least from the evidence in this record, appear tenuous.  Rather,  this case strikes me as one where the 7th Circuit would have viewed the relationship between C & S and Penn Traffic as 'distant' at the time the proof of claim was filed; in such circumstances, the principles of constructive notice lose their force.

Indeed, in El Paso, the court only imputed notice to the defendants because their attorney actually discovered the proof of claim several years after the filing of the bankruptcy. It was this actual notice to Counsel which started the clock running against the defendants. No such actual notice exists here, however. Mr. DeBella contended that he verbally advised some members of the C & S team that the fund had a 'potential' or an actual claim against C & S.  Yet, none of the C & S team could remember any conversation with Mr. DeBella about a claim against C & S for withdrawal liability.  Moreover, the record fails to indicate that these verbal notices contained the requisite statutory amounts, giving notice of the amount of liability and a schedule of payments.  Accordingly, the Fund, at best, established that there may have been conversations between the parties about the liability of C & S here for Penn Traffic's withdrawal liability, but there was no evidence that such notice included the particulars required by the statute.  29 U.S.C. Section 1399 (b)(1).

Accordingly, I find that the filing of the demand for arbitration was timely as it followed on the heels of the filing of the lawsuit by the Fund against C & S in the Northern District of New York.  Once that suit was filed, C & S timely sought review of the demand with the Fund, and timely filed for arbitration.  Accordingly, I shall proceed to determine the merits of the Fund's claim.  See 29 U.S.C. Section 1401 (a)(1)(B).

## II. Metz requires the use of actuarial assumptions in effect in 2009

The Metz decision came down from the Second Circuit on January 2, 2020, and each party well knew prior to its issuance that the ruling of the Second Circuit would impact the case before the undersigned arbitrator.  In Metz, the National Retirement Fund used Buck Consultants (Buck) as its actuary, and for many years, Buck utilized an interest rate of 7.25% when valuing Unfunded Vested Benefits.  However, in October 2013, the Fund replaced Buck with Horizon Actuarial Services, effective as of 2014. Metz Culinary Management, the Employer here, withdrew from the Fund on  May 16, 2014. If the interest rate in effect at the end of 2013 had been used, Metz's liability would have been $254,644.  However, in June 2014, Horizon informed the Fund's trustees that it was reducing the interest rate assumption for withdrawal liability purposes from 7.25% to 3.25%, the P.B.G.C. rate.[90]   The Fund calculated the withdrawal liability for Metz by determining the unfunded vested benefit on December 31, 2013 using the 3.25% interest rate.  With this new interest rate, Metz's 2014

---

[90]Metz, supra at 148.  See also Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc's Notice of Supplemental Authority, Exhibit 7, Metz Joint Appendix, p. 25.

withdrawal liability came to $997,734.   The Fund sent a letter to Metz's attorney on December 26, 2014[91] advising Metz of the revised withdrawal liability calculation and demanding payment in the amount of $997,734 in installments.

The matter was brought before Arbitrator Jaffe when Metz filed for arbitration upon the Fund's demand for payment in the higher amount.   The parties agreed that a preliminary issue concerning the interest rate used in calculating the withdrawal liability of Metz could be decided on the basis of stipulations and briefing.[92]   Arbitrator Jaffe noted in his interim opinion[93] that ERISA required the withdrawal liability here to be calculated on the value of the UVB's as of the end of 2013.[94] Jaffe noted that the 7.25% interest rate was used to calculate "the pools for plan years preceding 2013" but that the interest rates used by the PBGC for mass withdrawals ('PBGC rates')  were used for 2013.  By using the 3.25% in 2013, the value of the UVB's increased by $3,068,243, 382, and the Employer's share was $877,824, or 88% of its withdrawal liability.[95]

Like the Fund before me, the Fund in Metz, through its actuary, had used the 7.25% interest rate both for funding purposes and for calculating UVBL's for withdrawal liability purposes, in Metz's case through the end of 2013.[96]  Jaffe indicated that it was not possible to determine the precise date when the Horizon actuarial firm decided to put the new interest rate into effect for purposes of calculating withdrawal liability.  However, there was a memorandum from Horizon dated October 3, 2014 that indicated the actuaries intended to use the new rate for withdrawals after January 1, 2014.  Furthermore, the initial Demand Letter for withdrawal liability submitted to the employer on May 16, 2014 "utilized an estimate of the 2013 pool that was clearly determined with use of either the PBGC rates or some other interest rate assumption that varied significantly from the 7.25% rate that was used by

---

[91] See. Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc's Notice of Supplemental Authority, Exhibit 7, Metz Joint Appendix, p. 152.

[92]Metz, supra at 149; Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc's Notice of Supplemental Authority, Exhibit 7, Metz Joint Appendix, p. 22 - 23.

[93]Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc's Notice of Supplemental Authority, Exhibit 7, Metz Joint Appendix, p. 22 - 41.

[94]Ibid, p. 23.

[95]Ibid.

[96]Ibid, p. 24.  In the case before the undersigned arbitrator, the same interest rate was used for both purposes through the end of 2009.

Buck and was in effect during 2013."[97]   However, "[n]o evidence was introduced that reflected a decision by Buck or Horizon on or before December 31, 2013 to change to the use of the funding interest rate of 7.25% for purposes of calculating the Fund's UVBL's for withdrawal liability purposes as of December 31, 2013".[98]

Jaffe found that the Employer in <u>Metz</u> withdrew in 2014, and that the measurement date for withdrawal liability was December 31, 2013, "the end of the Plan Year preceding the year of the Employer's withdrawal from the Fund."[99]   Jaffe continued:

> That liability has been described as a 'snapshot' in the sense that events that occur post-December 31, 2013, may not affect that liability.  Thus, if during the period after December 31, 2013, the performance of the Fund with respect to its assets turns out to be significantly less or significantly more than what was projected based upon the Fund's assumptions, that fact provides no basis to adjust the Employer's withdrawal liability.[100]

Jaffe also cited two PBGC memoranda which had been cited by the Employer against the retroactive application of data to UVBL's.  In one memorandum, Opinion Letter 90-2, the PBGC opined that even where a calculation error is discovered in the year after the measuring date, a correction cannot be made to the prior year's calculation of withdrawal liability.[101] Arbitrator Jaffe went on to reference two of his previous opinions, one[102] where he

---

[97]Ibid. p. 26

[98]Ibid, p. 26.

[99]Ibid, p. 32.

[100]Ibid, p. 32-33.  Jaffe also cited the decision in <u>Combs v. Classic Coal Corporation</u>, 931 F. 2d 96 (D.C. Cir. 1991) which held that "on review of the reasonableness of the selected fund actuarial assumptions, including the interest rate assumption, the subsequent actual returns experienced by the fund were irrelevant to whether the selected interest rate assumption satisfied the requirements of MPPAA, and reasoning that once liability is determined as of the snapshot date it does not change on the basis of subsequent experience." Ibid, p. 33.

[101]The Opinion was later clarified (Opinon letter 94-5) to show that in the prior opinion letter, the PBGC was referring to "errors relating to mistakes or varying date or actuarial assumptions, rather than errors that are purely mathematical or computational in nature." Ibid, p. 34.

[102] <u>D.A. Nolt and Roofers Local 30 Combined Fund</u>, AAA Case No. 14 621 006093 07 (2009); Jaffe's Opinion was upheld by the District Court [<u>Roofers Local No. 30 Combined Pension Fund v. D.A. Nolt, Inc</u>. 719 F. Supp 2d 530 (E.D. Pa. 2010) and

determined that a Fund was precluded from retroactively modifying the UVB's of a fund when it discovered a programming error that had affected the initial calculation of withdrawal liability,[103] and another where the assumptions were changed, after the measuring date, as in the instant case.[104]  In both instances, the challenges to the increased withdrawal liabilities that resulted were sustained.  Finally, he noted that the IRS has determined that Funds may revise Schedule B's when they wish to correct data errors, but that they may not do so for retroactive changes based on a change in actuarial assumptions.[105]

Jaffe concluded that the evidence in Metz showed that the actuarial assumptions were changed after the measuring date of December 31, 2013, and that the retroactive application of such rates to Metz's withdrawal liability was violative of MPPAA. The Fund tried to claim that no actuarial assumptions had been determined for UVB's when calculating withdrawal liability by the measuring date.  Jaffe rejected such a claim: "Absent some change by the Fund actuaries, the existing assumptions and method remained in place as of December 13, 2013."[106]  He continued:

> In the absence of some action by the Fund Actuary changing the interest rate or other actuarial assumptions prior to the end of a Plan Year, the interest rate and assumptions that were in effect during the Plan Year continued unchanged.   The actual calculation of UVB's may take place after December 31, 2013, after the data for 2013 has been complete, but the assumptions and methods used to calculate those UVB's for purposes of withdrawal liability must be those that were actually adopted and in effect as of December 31, 2013.[107]

---

affirmed by the Court of Appeals, 444 Fed. Appx. 571 (3d Cir. 2011).

[103]Ibid.

[104]Embassy Industries and Local 365 UAW Pension Trust Fund, AAA Case No. 13 621 01504 06 (2008).

[105]IRS Technical Advice Memorandum 8831003 (April 25, 1988; IRS Chief Counsel Advisory 200728001*July 12, 2007, and IRS Private Letter Ruling 200639003.

[106]Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc's Notice of Supplemental Authority, Exhibit 7, Metz Joint Appendix, p. 37.

[107] Ibid, p. 38. Jaffe found that to hold otherwise would open the door to "bias and manipulation" on the part of the Fund.  Ibid.

The Fund was ordered to recalculate the withdrawal liability using the 7.25% interest rate in effect at the end of 2013, which resulted in a reduction of withdrawal liability to $250,000.[108] Metz did not object to the revised figure, and Jaffe issued a final award on March 28, 2016, affirming the calculation.[109]

The Fund and its trustees brought suit pursuant to 29 U.S.C. Section 1401 (b)(2) and 1451 to vacate Jaffe's award.    The United States District Court took issue with the Arbitrator's conclusion that the interest rates from the year ending on the measuring date carried over to the following year absent some affirmative action by the Plan's actuaries prior to the measuring date, finding that such thinking violated ERISA Section 4213.  That section requires actuaries to calculate  withdrawal liability based on ''assumptions and methods which in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan...."[110]  The Court found that actuaries could not possibly perform this duty under 4213 without examining data from the most recent plan year, There was no evidence that the actuaries had affirmatively done so:

> An actuary may ultimately conclude that the prior plan year's assumptions continue to be reasonable in light of all of the available data, but she must affirmatively reach that conclusion in order for the assumptions to qualify as such....[t]here is no evidence here that any actuary analyzed and concluded that the 2013 Plan Year assumption as applied to the 2014 Plan Year were reasonable or were the actuary's best estimate....A consequence of the Arbitrator's holding would be that actuarial assumptions would remain operative in perpetuity *sans* input from the actuary; this is entirely at odds with Section 4213. Section 42313 does not allow stale assumptions from the preceding plan year to roll over automatically - unlike wine, actuarial assumptions do not improve with age.[111]

The Court further found that the Arbitrator's holding was violative of Section 4211 of ERISA, 29 U.S.C. Sections 1391(b)(2)(A)(ii), (b)(2(E)(I), (c)(2)(C)(I), (c)(3)(A), and (c)(4)(A). She noted that ERISA 4211 did not require that withdrawal liability be calculated with

---

[108]National Ret. Fund v. Metz Culinary Mgmt, Inc. 16-CV-2408 (VEC) (S.D. N.Y. 2017), p. 8.

[109]Ibid.

[110]29 U.S.C. Section 1393(a)(1), National Ret. Fund v. Metz Culinary Mgmt, Inc. 16-CV-2408 (VEC) (S.D. N.Y. 2017), p. 12

[111]National Ret. Fund v. Metz Culinary Mgmt, Inc. 16-CV-2408 (VEC) (S.D. N.Y. 2017), p. 13

assumptions 'in effect' as of the measuring date, but required that it be calculated based upon the value of UVB's 'as of' such a date.  She noted there was a different in the two terms cited.  The interest rate 'in effect' as of the measuring date was for employers withdrawing during 2013.  The UVBL's used for withdrawal liabilty for such employers was required to be calculated 'as of' December 31, 2012:

> Similarly, ERISA requires the unfunded vested benefits amount (and the interest rate assumption necessary to calculate that amount) for the 2014 Plan Year to be calculated as of December 31, 2013, meaning it must incorporate data up through December 31. 2013.  The unfunded vested benefits amount (and the interest rate assumption necessary to calculate that amount) applicable to the 2014 Plan Year would then go in effect starting on January 1, 2014.  Accordingly, 'in effect' is the in force date, while 'as of' is the measurement date. The Arbitrator incorrectly conflated the two.   As explained above, the withdrawal liability interest rate assumption in *effect* on the Measurement Date is not applicable to the upcoming plan year unless the actuary affirmatively determines that the assumption, in combination with her other assumptions, is reasonable and her best estimate of anticipated experience under the plan *as of* the Measurement Date."[112]

Thus the court rejected Jaffe's assumption that interest rates automatically carry over from one year to the next, for withdrawal liability purposes, absent affirmative action by the actuaries.   Further, the Court found that ERISA did not require actuaries to make assumptions for withdrawal liability purposes by the measuring date:

> Nothing in ERISA Section 4213...requires an actuary to select her assumptions by the Measurement Date.  See 29 U.S. Sec. 1393(a)(1).  ERISA Section 4213 is silent regarding the timing of an actuary's selection of her assumptions.  As explained above, the requirement in ERISA Section 4211 that the actuary calculate unfunded vested benefits 'as of the end of the last plan year' does not require the actuary to make her assumptions by the Measurement Date but only requires unfunded vested benefits to be *measured* as of that date."[113]

The Court noted that the actuary does not have a full year of data by the measurement data, and thus she cannot come up with appropriate assumptions, and fulfill her obligations under Section 4213 of ERISA if assumptions must be chosen by the end of the year prior to an

---

[112]Ibid, p. 14.

[113]Ibid, p. 18.

employer's withdrawal.[114]  For all of the reasons above, Arbitrator Jaffe's award was vacated.

The matter was appealed by Metz to the United States Court of Appeals for the Second Circuit, the Circuit whose law governs this arbitrator. That Court framed the issue as follows: "...whether under the MPPAA, a fund may select an interest rate assumption after the Measurement Date and retroactively apply that assumption to withdrawal liability calculations."[115]  The Court disagreed with the District Court's finding that interest rates in effect as of the measuring date are not permitted to simply role over:

> ERISA and Congress's guidelines for calculating an employer's withdrawal liability, see Section 4213 of ERISA, 29 U.S.C. Section 1393, are silent as to whether interest rate assumptions on the Measurement Date must be affirmatively adopted, owhether, absent an actuary's affirmative selection of a new assumption rate, the rate in effect during the previous plan year rolls over automatically.  Although the district court held that "Section 4213 does not allow stale assumptions from the preceding plan year to roll over automatically," App'x at 278, there is no statutory or caselaw support for that proposition, and we do not agree with it."[116]

The Court was obviously bothered by the retroactive nature of the interest rate's application:

> Moreover, Section 4214 imposes a notice requirement on multiemployer funds for any plan rule or amendment with respect to withdrawal liability.   The legislative history demonstrates that it was designed to protect employers from the retroactive application of rules relating to the calculation of withdrawal liability:
>
>> There are several situations where plans, in the application of their own rules, either initially or by amendment, are permitted a wide degree of latitude in allocating calculating withdrawal liability.

---

[114]The Court also rejected Metz's argument that ERISA Section 4214 prohibits retroactive application of a rate selected after the measuring date to withdrawing employers, finding that the section of ERISA which Metz said prohibited such an application applied only to plan rules and amendments, not actuarial assumptions. Ibid, p. 20 - 21.

[115] Fund ex rel. Legacy Plan of the Nat'l Ret. Fund, v. Metz Culinary Mgmt., Inc., supra, 946 F. 3d 146, 150 (2nd Cir. 2020).

[116]Ibid.

> In order to protect an employer from certain retroactive changes in a plan's rules, the bill [H.R. 3904] prohibits the retroactive application of a plan rule or amendment relating to withdrawal liability from applying to a withdrawal occurring before its date of adoption, unless the employer consents to its earlier application....
>
> Under the bill, when a plan rule or amendment affects withdrawal liability, the plan sponsor is required to give notice of the adoption of the rule or amendment to all employers required to contribute to the plan and to all employee organizations representing employees covered by the plan.  H.R. Rep. No. 96-869, pt. 2 at 30. [117]

The Court found that although Section 4213 did not define the terms 'plan rules and amendments' and 4214 did not discuss retroactivity, the Congressional intent nonetheless showed that the retroactive application of a change in interest rate assumptions, as permitted by the District Court, was violative of ERISA.  The Court further noted that particular sections of ERISA, such as 29 U.S.C. Section 1021(l)(1)(A) and (B) allow employers, in advance of withdrawal to receive notice of their potential withdrawal liability. "Such provisions are of no value if retroactive changes in interest rates assumptions may be made at any time."[118]  The Court concluded that absent any affirmative changes by the actuaries prior to the measuring date, the interest rate in effect as of the measuring date is the interest rate assumption that must be used for purposes of calculating withdrawal liability:

> In considering the retroactive selection of interest rate assumptions, we conclude that the assumptions and methods used to calculate the interest rate assumption for purposes of withdrawal liability must be those in effect as of the Measurement Date.  Absent a change by a Fund's actuary before the Measurement Date, the existing assumptions and methods remain in effect.  Were it otherwise, the selection of an interest rate assumption after the Measurement Date would create significant opportunity for manipulation and bias.  Nothing would prevent trustees from attempting to pressure actuaries to assess greater withdrawal liability on recently withdrawn employers than would have been the case if the prior assumptions and methods actually in place on the Measurement Date were used.  Actuaries unwilling to yield to trustees'

---

[117]Ibid, pp. 150-151.

[118]Ibid, p. 151.

preferred interest rate assumptions can be replaced by others less reticent.[119]

The Court went on to discuss, although did not appear to rely on, the Supreme Court's dicta in Concrete Pipe & Products of California, Inc. V. Constructions Laborers Pension TR., 508 U.S. 6702, 632, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993) which appeared to favor the use of common assumptions for calculating UVB's and withdrawal liability because of the potential for bias and abuse if different rates are used:

> The opportunity for manipulation and bias is particularly great where funds use different interest rate assumptions for withdrawal liability and minimum funding purposes.  Indeed, Arbitrator Jaffe specifically acknowledged that "[t]his potential for bias to operate is particularly great if the changed assumptions and methods relate only to those used to calculate the [UVB's] of the fund for purposes of withdrawal liability and not for funding or other purposes (as appears to have been the case in this matter)". App'x at 39-40 (emphasis added), see Concrete Pipe, 508 U.S. at 633 n. 19, 113 S. Ct. 2264 ("we are aware of at least one case in which a plan sponsor exercised decisive influence over an actuary whose initial assumptions it disliked") (cit-ing Huber v. Casablanca Indus. Inc. 916, F.2d 85, 93 (3d. Cir. 1990) ). *This appeal, therefore, illustrates the type of results that can be 'attacked as presumptively unreasonable both in arbitration and on judicial review' of which Concrete Pipe warns.*[120] Concrete Pipe, 508 U.S. at 633, 113 S. Ct. 2264."[121]

The Court concluded:

> We hold the interest rate assumptions for withdrawal liability purposes must be determined as of the last day of the year preceding the employer's withdrawal from a multiemployer pension plan.  Absent any change to the previous plan year's assumption made by the Measurement Date, the interest rate assumption in place from the previous plan year will roll over automatically.[122]

---

[119]Ibid.

[120] Ibid, p. 152, emphasis supplied by arbitrator.

[121]Ibid.

[122]Ibid.

The judgment of the District Court was vacated, and any remaining arbitral issues were referred back to arbitrator Jaffe.

The undersigned is bound by the decision of the Second Circuit, as parties here were operating under its jurisdiction.  Whether I personally agree or disagree with the Opinion of the Second Circuit is of no matter; it governs the decision here.  Accordingly, the interest rate in effect as of the Measurement Date, December 31, 2009, is the one that had to be utilized in calculating the withdrawal liability of the Employer here.  Moreover, I find that the other assumption that was changed here when the withdrawal liability was re-calculated, the mortality table, must also revert to the mortality assumption in use as of the Measurement Date.  The concerns over potential adverse effects on employers when retroactive interest rates are applied, as expressed in the Congressional history, as well as the concern of the Court over potential abuse, are equally applicable to mortality tables,.  Accordingly, I find that the mortality table in effect as of the Measurement date is the one that must be applied in the instant case.

### III. The Fund's Arguments Distinguishing Metz or Interpreting It to Increase C & S's Liability are Rejected

The Fund raised numerous arguments in responding to the decision in Metz, which were not initially raised in its prior briefs on the merits.  C & S contends that the undersigned should not even entertain any of these arguments against Metz set forth by the Fund.  It pointed out that the Fund indicated in its post-hearing brief that Metz would govern the outcome, and the "failure to raise an argument in one's brief waives that argument." Norton v. Sam Club's, supra.  I hesitate to hold the Fund to the arguments it raised in its initial  post-hearing briefs.  The Second Circuit had not yet decided the Metz case when such briefs were filed.  The Fund would have been at a severe disadvantage in terms of presenting cogent arguments on the Appellate Court's decision in Metz were I to have required it to set forth arguments in its initial briefs questioning or distinguishing rationales which had not yet been articulated.  Only upon seeing the bases for the Court's decision could the Fund properly raise arguments  before me to narrow the application of the Court's analysis.  I gave it the time to consider the Second Circuit's decision and raise arguments, and I consider, seriatim, such points raised in the supplemental submissions on the merits.

First it argues that Metz does not change the fact that the arbitration was untimely.  I have, however, previously ruled against it on that point.  Second, it argues that Metz cannot be applied retroactively, but only to a case still open on direct review.  The Fund contends that C & S's demand for arbitration cannot meet the requirement of a case 'still open on direct review' under the Supreme Court decision in Harper v. Virginia Dept. Of Taxation, 509 U.S. 87, 97 (1991) because the withdrawal liability was decided against Penn Traffic back in 2010.  However, such an argument would dictate against any filing by C & S to challenge the withdrawal liability the Fund is demanding of it, even including this arbitration.  Yet, aside from the argument on timeliness, I did not see any argument raised by the Fund concerning my jurisdiction to hear a case about the amount of withdrawal liability which should be assessed against C & S.  The liability of Penn Traffic was settled in 2010, but the liability of C & S remained an open question until the Fund filed suit against C & S in 2016, as a result

of which C & S filed this arbitration.  This arbitration is clearly still open and pending, and I fail to see why <u>Metz</u> cannot be applied to the results here.  Nothing in the decision here will change the liability of Penn Traffic as determined by the Bankruptcy Court.  I merely decide the *amount* of liability of C & S, and the courts decide the very issue of its liability.  This argument is thus rejected

Next, the Fund argues that its plan rules permit that "[t]he actuarial valuation for a Plan year ending on December 31 will be finalized during the immediately following calendar year."[123]  It contends that such rules were agreed to by Penn Traffic and by C & S, presuming it is found to be a successor employer.  Moreover, such a result is sanctioned by <u>Metz.</u>  I disagree.  The Fund relies on the legislative history cited by the Second Circuit in <u>Metz</u>:

> In <u>Metz,</u> the Second Circuit analogized the plan's change in assumptions to a new plan rule and emphasized that plan rules with respect to withdrawal liability are not only permissible, but they may even be applied retroactively with 'the employer[']s consent."[124]

However, the Court, in my view, did not analogize interest rates to plan rules.  It merely stated 1) that its holding regarding interest rates was consistent with the congressional intent which, per the legislative history, barred the retroactive application of plan rules absent consent by the employer or employers, and 2) that the holding of the district court was contrary to such intent.  As pointed out by the Fund, there was no plan rule at issue in <u>Metz</u>.  However, plan rules and actuarial assumptions are two separate items.  There certainly is no language in <u>Metz</u> that they should be similarly treated.   Indeed, the Court specifically noted that there was no definition of plan rule or plan amendment in Section 4214 of ERISA.

Moreover, the Fund's argument appears to be at odds with the Court's analysis of 29 U.S.C. Section 1021(l)(l), set forth at page 151 of its decision.  This provision deals with the obligation of the plan administrator, upon request to provide an estimated amount of the employer's withdrawal liability, and the basis for the calculations, including the actuarial assumptions used.  The Court noted that "[s]uch provisions are of no value if retroactive changes in interest rates assumptions may be made at any time."[125]  There may indeed be some conflict between 4214 (29 U.S.C. 1394) in light of the legislative history and 29 U.S.C. Section 1021(l). However, with the lack of definition of the term "plan rules and amendments" and the ruling in <u>Metz</u>, a resolution of such a conflict is better left to the courts of appropriate jurisdiction as opposed to an arbitrator whose jurisdiction under ERISA is limited.

---

[123]See Exhibit C-40; Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc.'s Notice of Supplemental Authority, p. 3

[124]<u>Metz</u>, supra at 150 (quoting H.R. Rep. No. 96-869, pt. 2 at 30).

[125]<u>Metz</u>, supra, at 151.

Case 1:20-cv-02434-ABJ   Document 1-1   Filed 08/31/20   Page 47 of 53

Accordingly, I am not persuaded by the Fund's argument that the plan rules change the result here.

The Fund next argues that Mr. Goldfarb, the plan's actuary , decided in 2009 to change the actuarial assumptions in 2009.  However, Goldfarb couldn't apply his decision in 2009 because Breck Sherwood of Horizon advised they had already selected the assumptions for that year.  Moreover, to have applied his decision in 2009 would have violated Metz,[126] according to the Fund,  as set forth above in the section narrating the positions of the parties.  I am not persuaded by the Fund's argument.  First, Mr. Goldfarb's decision, from my reading of the record, was not communicated to anyone except Mr. Sherwood.  The first inkling the Fund had that actuarial assumptions were to be changed was in June of 2010 when the actuaries met with the Trustees.  If assumptions can be changed and kept secret until after the measuring date, it seems to me that the entire thrust of the Court's reasoning in Metz is negated.  The Court spoke at length about the necessary information that needs to be given to employers before they make a decision to withdraw, and also spoke of the potential for abuse by Fund managers if interest rates can be changed retroactively.  Certainly, such concerns of the Second Circuit would hardly be met were the rationale of the Fund on this point adopted.  Accordingly, it is rejected.

Finally, the Fund argues that if Metz applies, it would apply to the determination of the Pension Fund's assets and liabilities.  Instead of valuing the assets with data received in 2010 showing Fund performance for the prior year, it would have to evaluate the pension fund's assets and liabilities *as of* the measuring date:

> The phrase 'as of' appears fifteen times in Section 1391, and it never once refers to assumptions in particular.  Rather, it is the 'unfunded vested benefits' that must be calculated 'as of' the measurement date.  See e.g. Section 1391(b)(2)(E).  That means that under Metz, aspects of the Pension Fund's unfunded vested benefits' calculation which Horizon had not yet determined to change, would 'roll[] over automatically' from 'the previous plan year'.  Metz,  946 F. 3d at 150.  The existing calculation, as of December 31, 2009, was the Pension Fund's 2009 actuarial valuation, which was finalized on October 8, 2009. See Ex. C-25.[127]

The Fund may well have a valid argument as to the reach of the Metz decision.  But, as noted above, I have difficulty applying its principles to matters beyond those dealt with in Metz and at issue here: actuarial assumptions.  Metz applies to assumptions only, and I

---

[126]See Positions of the Parties, above.

[127] Respondent New York State Teamsters Conference Pension and Retirement Fund's Response to C & S Wholesale Grocers, Inc.'s Notice of Supplemental Authority, p.8.

hesitate to read it broadly to apply to the myriad of calculations that are determined by actuaries, based on their best estimate of plan value, even where some of those calculations were determined after the measurement date. Arbitrators, for the most part, are to deal with the amount of withdrawal liability, while legal questions, such as the successorship of one employer to the responsibilities of another, are left to the courts.  The Fund is essentially asking the undersigned to go beyond the boundaries of the  decision in Metz, and apply its underlying principles to the situation before me.  Such a task is better left to the Second Circuit.  The undersigned is confident, based on Metz, that assumptions cannot be retroactive.  As to the retroactive applications of other actuarial calculations which are not assumptions, the Courts will have to rule. The parties have given every indication to the undersigned that my decision, as well as the decision on the successorship of C & S are to be appealed.  Those judicial fora are the better deciders of these matters.  I for one, shall restrict this decision to the holding in Metz itself.

## IV. As Metz is Dispositive, No Further Ruling on the Merits is Warranted

The parties spent a great deal of time during the hearing on the consistency of interest rates and mortality assumptions as used in calculating minimum funding and withdrawal liability.  C & S took the position that the same interest rates and mortality assumptions must be used when calculating both figures. The Fund argued that assumptions could differ when used for different purposes. I need not decide such an issue, because for purposes of this case, Metz has determined that the interest rate assumption in effect as of the measurement date must be used. I have applied Metz to the assumption regarding the appropriate mortality table as well.  In 2009, these actuarial assumptions (interest rate and mortality table) were the same for minimum funding and withdrawal liability. Only in 2010 did the actuaries look to the PBGC rates and mortality tables when they decided to apply different actuarial assumptions for withdrawal liability than those used for minimum funding. Accordingly, any ruling on a requirement of consistency in actuarial assumptions for minimum funding and withdrawal liability would amount to the expression of a mere personal belief on the part of this arbitrator rather than a resolution of a dispute between these parties.  The dispute here was resolved by Metz.  Personal judgments and beliefs of this arbitrator are superfluous and antithetical to the arbitration process itself which is set up for the purpose of dispute resolution.

## V. Other Post Hearing Submissions

### A. Correspondence on New York Times V. Newspaper and Mail Deliverers' - Publishers'  Pension Fund (Case Nos. 18-1140, 18-1408 (consolidated)

Mr. DeBella, counsel for the Fund, wrote the undersigned on September 19, 2019 regarding a purported attempt on the part of the Employer here to further delay proceedings. In his missive, he suggested that C & S's Post-Hearing Brief suggested that the arbitrator might want to wait until the Second Circuit issued its opinion in the New York Times matter, cited above. The case concerned  C & S's argument contending that the actuarial assumptions must be the same for minimum funding and withdrawal liability.  Mr Miller of C & S was also representing one of the parties in the New York Times case.  Mr. DeBella

apparently was concerned that such a notation by C & S to the New York Times case in its brief could persuade the undersigned to further delay the proceedings. He therefore pointed out that the New York Times matter had been withdrawn earlier in the week when his letter was written. Mr. Miller submitted a response on September 23 2019, noting that the District Court had found the use of the Segal Blend method unlawful, 303 F. Supp. 3d 236, 255 (S.D.N.Y. 2018). Technically, Mr. Miller stated, the matter was withdrawn by the Fund, who had appealed the District Court decision to the Second Circuit. Mr. DeBella submitted a further response on September 24, 2019. Both parties referred me to the recording of the oral argument before the Second Circuit, and indeed the Fund provided a copy of the audio file.

There is nothing relevant for me to consider in this exchange of letters as I have found that I need not rule on the question of the use of differing actuarial assumptions for minimum funding and withdrawal liability. In the instant case, the assumptions here were the same, under Metz, as fully discussed above. Therefore, I need not consider the arguments before the Second Circuit in New York Times, supra. Any concerns about delay are obviously no longer relevant as the undersigned needed far more time for the writing of this Opinion than the time contemplated by the parties in September, 2019.[128]

B. The Submission of Additional Documents Regarding the Fund's Response to Metz

During our post-hearing discussions on Metz, the Fund sought to reopen the record to submit additional documents. It felt such additional documents might be relevant in defense of its position respecting Metz. As a result of discussions between the parties, by telephone, I concluded that the Fund was seeking to admit such documents in anticipation of certain arguments the Employer might make. I suggested waiting until after the Employer put forth its submission, and, at such time, we would see if such 'anticipatory' documents were necessary. They were not.[129]

C. Additional Submissions on Metz Not Initially Permitted by the Arbitrator

Initially, after the Metz decision was issued, I gave the parties an opportunity to fully brief its impact. The last filing from C & S was due on February 7th. After February 7th, the Fund submitted an additional memorandum on February 11th addressing certain waiver arguments that had been raised by C & S in its ultimate filing. Although I had given the Fund permission to file a request to reopen the hearing after the February 7th deadline, (See Section 'B' above), I had not given it permission to file additional substantive arguments. In

---

[128]For similar reasons I need not consider the post hearing filings on United Mine Workers Of Am. 1974 Pension Plan v. Energy West Mining Co., No. 1:18-cv-1905 (May 22, 2020) and Sofco Erectors, Inc. V. Trustees of the Ohio Operating Engineers Pension Fund, No. 2: 19-cv-2238 (S.D. Ohio May 19, 2020).

[129]See Memorandum of January 22, 2020 of telecon of January 21, 2020, Exhibit B attached.

any event, in an effort to create a complete record, I accepted the Fund's post February 7th filing, and I further gave the Employer an opportunity to respond.  As can be seen above, I fully dealt with the substance of the Metz case as it applied in the instant matter, and I was not persuaded to accept arguments by either party that either one of them had waived certain arguments regarding the impact of Metz.

### D. Consideration of Amicus Briefs in Metz

Finally the Fund submitted a request for the undersigned to consider amicus briefs submitted by Horizon, its actuary, and the Fund, on the Petition for Certiorari in Metz.  It also requested that I consider a position statement from the American Academy of Actuaries.  The request was opposed by C & S.  This request was rejected for the reasons set forth in the attached email, Exhibit C.[130]

### VI. The Fund is Not Entitled to Attorney's Fees and Costs

The Fund has sought payment for certain attorney's fees and costs that it incurred in handling the hearings in this matter.  It argued that the presentation of the Employer's case could have been shortened as the Employer had fully litigated a similar matter before another arbitrator; the record before that arbitrator was included in the instant hearing.  I find no merit to the Fund's argument.

The Fund itself certainly does not come before me with clean hands with respect to arguments on expenditure of time.  The Fund itself created the need for a telecon between the parties because of its efforts to submit certain documents that were anticipating arguments to be raised by the Employer.  Surely, the more efficient method of handling the matter would have been to wait and see what arguments were actually raised.  Indeed, in the end, the arguments were not raised, and the Fund did not need to submit additional documents.  More important, however, is the fact that I sit as the finder of fact in the instant matter.  I do not sit as counsel.  I am loathe to tell either party how to put on its case, and, as I think the record bears out, great latitude was given to both sides when it came to the questioning of witnesses and the manner in which they presented their evidence.  The record which could have been used in the instant case did not involve the very parties before me.  It was up to Counsel for the Employer to determine how to put on his case, and I will not let Counsel for the other side dictate how such case is to be presented before this arbitrator.  I fail to see that the Fund should financially benefit from its arguments in this regard, where, in my view, the hearing was fair and balanced, and counsel on both sides were equally responsible for the expenditure of time due to the extensive examinations of witnesses and submission of complex documents.  The request for Fees and Costs is Denied.

---

[130]Prior to this last request, the Fund had also submitted a Bloomberg Law article on the Metz case going to the Supreme Court, without objection from C & S.

## CONCLUSION AND AWARD

For the reasons stated above, the undersigned finds in favor of the Employer and orders that the Amount of Withdrawal Liability owed by C & S, be recalculated with the actuarial assumptions in effect on the measurement date of December 31, 2009[131], should it be found after the exhustion of all relevant appeals, that C & S is a successor employer to Penn Traffic,

Done this 25th day of August, 2020 at San Antonio Tlayacapan, in the Municipality of Chapala, State of Jalisco, Mexico.

Respectfully submitted,

_____
Mariann E. Schick, Esq.
Arbitrator

---

[131] Interest rate of 8.5% and RP-2000 mortality table.